AUSTIN B. FULLER ET UX. *vs.* THE METROPOLIAN LIFE INSURANCE COMPANY OF NEW YORK.

Third Judicial District, Bridgeport, April Term, 1898.   ANDREWS, C. J., TORRANCE, BALDWIN, HAMERSLEY and HALL, Js.

The defendant, a life insurance company, issued certain participating tontine endowment policies upon the "reserve dividend plan." *Held* that the meaning of the expression quoted, and the nature and extent of the obligations assumed by the company under the terms and conditions of its policies, were questions of law, and could not be concluded by any finding of fact by the trial court.

The policies in question, most of which were for a term of ten years, provided among other things, that at the end of the stipulated period the defendant would pay each of the persistent and surviving policy-holders his equitable proportion of the reserve dividend fund in cash; that an equitable surrender value would be allowed only at such time as a dividend might, by the terms of the policy, be due and payable; and that no policy should be entitled to share in the dividend surplus until the expiration of its term, or until the end of a reserve dividend period. This method of disposing of the surplus the policy termed the "reserve dividend plan." The plaintiffs contended that by the terms of the policies the defendant incurred certain fixed liabilities, payable to the surviving policy-holders of the class at the end of the stipulated period, the amount of which equalled the sum of the usual yearly dividends and the total legal reserves on lapsed policies, increased by compound interest and undiminished by losses, death claims or expenses. *Held:*

1. That this claim could not be supported, whether the policies were construed alone or in the light of a canvassing pamphlet used by the defendant and entitled "Key to the Reserve Dividend Plan;" that the obligation assumed by the company was the distribution in cash to its surviving policy-holders of the surplus on hand at the

end of the class period, after having paid the cost of insurance, the expenses of management chargeable to these policies, and providing for the future cost of insurance on continuing policies. (*Two judges dissenting.*)

2. That if the contention of the plaintiffs were adopted, the insurance contracts would become mere mutual wagers upon the chances of life, without any element of protection, and consequently void. (*Two judges dissenting.*)

It is one of the fundamental conditions of mutual insurance that dividends must be derived from the overpayments of policy-holders, and that there can be no dividend, annual or otherwise, unless at the time there is a surplus in the hands of the company.

While experts may be called to define terms of art and, when necessary, to explain the principles of their science, they cannot be permitted to instruct the court as to the meaning and legal interpretation of a written instrument, or to give their opinion thereon.

It is within the discretion of this court to set aside a judgment founded upon inadmissible evidence, notwithstanding it appears from the record that a new trial cannot legally produce a different result.

Great prolixity in the assignment of alleged errors in an appeal is unjustifiable.

[Argued April 19th—decided July 26th, 1898.]

SUIT for a cancellation of certain receipts given to the defendant, for an accounting, and for damages, brought to the Superior Court in New Haven County and tried to the court, *Shumway, J.;* facts found and judgment rendered for the defendant, and appeal by the plaintiffs for alleged errors in the rulings of the court. *Error and judgment set aside.*

The complaint contains forty-one counts. Each count sets up a different policy of insurance, but they are all alike in other respects. The first count is as follows: " 1. On October 26th, 1872, the defendant issued to John S. Follansbee, of Bridgeport, Connecticut, a policy of insurance under the seal of the defendant, on his life, for the benefit of his wife, Eunice R. Follansbee, for a sum of money exceeding one thousand dollars. 2. The plaintiffs are unable to state the amount of said policy, or to annex a copy of the same to this count because, as is hereafter stated, said policy has been delivered to the defendant, and is now in its possession. 3. Said policy of insurance was duly signed, executed by the proper officers of the defendant, and was in all respects a

valid and binding contract between the defendant and said John S. Follansbee and Eunice R. Follansbee. 4. Among other promises and agreements contained in said policy there was the following agreement, to wit: 'This policy is issued and accepted by the assured upon the following express conditions and agreements: At the request of the assured this policy is issued upon the reserve dividend plan; and the said company agrees that should the premiums be paid as herein stipulated for ten full years from date hereof, and that should the life insured survive said period of ten full years, said company will pay to the designee of this policy at the expiration of said period of ten years its equitable proportion of the reserve dividend fund in cash, and the same to be receipted for to said company.' 5. Said reserve dividend plan, referred to in the preceding paragraph, is set forth and expressed on pages 10 and 11 of a certain book entitled 'Key to Reserve Dividend Plan,' which book is hereto annexed and marked Exhibit A. Said reserve dividend plan, as therein stated, was originated by one William P. Stewart, who was the sometime defendant's actuary prior to the issuing of any of the policies stated in this complaint, and in the form as stated on pages 10 and 11 of this book had been adopted by the defendant prior to the issue of any of such policies, which plan, as expressed by said Stewart, and adopted by the defendant, was as follows: 'All who take policies of any denomination or character within the year form a class, which is treated by the company as a distinct body for ten years. Every year forms a separate class, and all are known by the year in which they terminate, as the class of 1880, 1881, etc. Policies issued in this way, like all other policies, are paid out of the general fund of the company when becoming a claim by death or limitation, and not, as sometimes supposed, out of the class fund. The company in issuing any policy guarantee two things: the amount insured, according to its terms, and an equitable share in all the surplus and earnings. The amount insured they pay after it becomes a claim. The surplus they divide by way of a cash dividend at the end of every year. The reserve

policies, however, in forming a class, stipulate among themselves that all the dividends allowed upon their policies for ten years shall be retained by the company, invested at the average rate of interest obtained upon their investments, and finally divided at the close of the ten years among the living members only. It is further stipulated that in case any member fails to keep his policy in force for the ten years he shall forfeit his reserve for the benefit of his class, which sum shall be kept at interest by the company, and divided in like manner. It follows, then, that for every class formed a fund will accumulate from five sources, as follows: 1. From the ordinary dividends as allowed by the company, accumulated upon existing policies. 2. From the accumulated dividends bequeathed to the class by dying members. 3. From the accumulated dividends forfeited to the class by retiring members. 4. From the reserves of all policies lapsing before the close of the class. 5. From the addition of compound interest. It follows, then, that the existing members at the close of the class will get, *besides receiving* all the ordinary dividends earned by their policies, more or less from all the last four sources. It is plain, therefore, that the dividend to the existing member at the close of the class *must be considerably larger than the dividend accumulating in the ordinary way.* Substantially what may be expected in reason this work is designed to show. It will be well to remember: that policies lapsing in one class do not benefit any other; that the expenses and death claims are paid out of the general fund of the company, and not charged to the class fund; that the lapses among ordinary policies benefit all policies alike; a partial indemnity to the reserve class for their greater vitality; that each class secures the investment of its funds at the best rate of interest available with safety, without any charge for investing it, as the expenses of the company are borne in an equitable manner by the policyholders in general; that the dividend at the close of the class is paid in cash, and no reversionary additions allowed; that at close of one class, unless the policy-holder signifies his desire to enter the new class then forming, he will be-

come as one of the ordinary members of the company, receiving the dividend at end of every year, and a surrender value in case of lapse.' $5\frac{1}{2}$. Between 1869 and 1872 the foregoing plan became well known to the public as the reserve dividend plan of insurance, and was known to the public by the name of the reserve dividend plan. In August, 1872, the defendant under its corporate seal agreed with William P. Stewart that the defendant would use the plan for five ensuing years, and at once thereafter the defendant adopted and used it, and announced it to the public as one of the distinctive plans of defendant, owned and used by it alone. In September, 1872, defendant, by writing, under its corporate seal, appointed Josiah N. Bacon, of New Haven, its general agent to canvass and procure applications for insurance on the lives of individuals, and to appoint and educate subagents; and in September, 1872, the defendant in writing, under its corporate seal, appointed Sherwood Sterling its general agent to canvass and procure applications for insurance on lives of individuals, and to appoint and educate subagents. Thereafter, and in September, 1872, the defendant, by John R. Hegeman, vice-president of defendant, and William P. Stewart, actuary of defendant, delivered to Josiah N. Bacon, and also delivered to Sherwood Sterling, copies of the said book, entitled 'Key to Reserve Dividend Plan,' and verbally instructed each of them to obtain insurance upon that plan, and to use those books to explain the said plan to applicants for insurance. Pursuant to these instructions said Josiah N. Bacon and said Sherwood Sterling represented and explained to each of the persons mentioned in the complaint, that the reserve dividend plan was the plan as stated in the fifth paragraph of the complaint, and exhibited to them copies of the said 'Key to the Reserve Dividend Plan,' and read to such persons pages 10 and 11 of said book, and declared to such persons that the book described the reserve dividend plan practiced by the defendant. Whereupon the persons mentioned in the complaint, upon the faith of the book so exhibited to them and the declarations of Bacon and Sterling that it represented the reserve dividend plan of the defend-

ant, and of their representations and explanations as to said reserve dividend plan, accepted said policies from the defendant, and paid premiums thereon for ten years to defendant, without notice of any other reserve dividend plan than as above stated. 6. The plaintiffs state upon information and belief that in the year 1872 many other persons, to wit, ten thousand, took out policies of life insurance on their respective lives, in varying amounts, from the defendant, under said reserve dividend plan. The policies in each case contained the agreement set forth in paragraph 4 of this count; and all such policy-holders formed a class known as the class of 1882. 7. The defendant has upon its books the names of all the policy-holders insured by the defendant on the reserve dividend plan, and the several amounts of said policies, and the payments thereon, and the plaintiffs know of but a few of the names of said policy-holders, which are set forth in this complaint, and do not know the amounts for which said policies were issued, nor the payments made thereon. 8. Many of the members of said class of said policy-holders allowed their policies to lapse during the said class period of ten years by reason of the non-performance on their part of the stipulations of said policies, but after payment of one or several premiums upon their respective policies; a few of said policy-holders died before the expiration of said period of ten years; and a few of said policy-holders, including said John S. Follansbee and Eunice R. Follansbee, maintained and kept their policies in force during the whole of the period of said ten years. 9. The books of the defendant will show who of said policy-holders died or allowed their policies to lapse, or kept them in force during said period of ten years. 10. During said period of ten years the defendant received large sums of money, amounting to several hundred thousand dollars, from said policy-holders, by way of premiums paid on their respective policies. Dividends were earned on said policies; substantially 50 per cent. of the premiums paid on each policy was held by the defendant as the reserve on said policy; and the defendant should have kept the class fund of said policy-holders invested, according to the terms

of said plan as before stated, and should have rendered to the policy-holders whose policies were in force at the termination of said class period a just and correct account of said class fund. 11. At the close of said class period, to wit, on the          day of          , 1882, the defendant by a letter which it wrote informed said John S. Follansbee and Eunice R. Follansbee that their proportion of the said class fund to which they were entitled according to said reserve dividend plan on their said policy, was the sum of          dollars ; and the defendant in said letter requested a return of said letter to the defendant, and the same is now in the possession of the defendant. 12. Said John S. Follansbee and Eunice R. Follansbee did thereupon return said letter to the defendant, and therefore the plaintiffs are unable to state the exact amount which the defendant so represented was their proportionate share of said class fund. 13. Said John S. Follansbee and Eunice R. Follansbee on the receipt of said letter from the defendant had no knowledge or information as to whether the amount which the defendant so represented as their true proportion of said class fund was such true proportion, or not. The defendant had always the exclusive charge of said class fund, and at the time of sending said letter knew and had the exclusive knowledge as to what was and should have been the just and true amount of such class fund, and knew that the amount stated in said letter was much less than the true amount thereof. 14. Said John S. Follansbee and Eunice R. Follansbee believed at the time of receiving said letter that the amount therein stated as their just proportion of said class fund was the just and true amount thereof; and in reliance upon said belief they returned said letter to the defendant, and received from the defendant the amount as stated in said letter to them as their proportion of said class fund, and also as the entire sum due to them from other provisions of said policy, and thereupon executed and delivered to the defendant a receipt for the sum so received, and returned to the defendant the original of said policy of insurance ; and they have now no copy of said letter, receipt, or policy of insurance. 15. On the          day

of            , 1889, said John S. Follansbee and Eunice R. Follansbee learned for the first time that the amount which had been so stated to them by the defendant in said letter, as aforesaid, as their true proportion of said class fund, was not the true and just amount thereof; but that their true and just proportion of said class fund would and did exceed the amount stated in said letter by several times, to wit, more than five times the amount so stated, and that the proportion of said class fund really due to them exceeded the amount paid them by the sum of more than one thousand dollars. 16. The defendant, in stating to them in said letter their proportion of said class fund, fraudulently concealed from them the truth concerning the real amount of said class fund, and of their just and true proportion thereof, in order to cheat and defraud them. 17. On the      day of            , 1889, the said John S. Follansbee and Eunice R. Follansbee for a valuable consideration assigned to Harriet A. Fuller, the plaintiff, all of their claims and the claims of each of them against the defendant, and she is now the equitable and *bona fide* holder and owner thereof. The assignment was as follows: ' For one dollar and other good considerations we, John S. Follansbee and Eunice R. Follansbee, do hereby sell, set over, transfer, and assign unto Harriett A. Fuller, of New Haven, Conn., all the claims, demands, and causes of action which we or either of us have or may have against The Metropolitan Life Insurance Company of New York, N. Y. Witness our hands and seals, this      day of            1889. New Haven, Conn. John S. Follansbee [L. S.]. Eunice R. Follansbee [L. S.].' The consideration therefor was expressed in the instrument executed by A. B. Fuller and delivered to the said Follansbees, as follows : ' Whereas, John S. Follansbee and Eunice R. Follansbee have this day assigned to Harriet A. Fuller, wife of Austin B. Fuller, of New Haven, Conn., a claim against The Metropolitan Life Insurance Company of New York, with the expectation that said claim will be prosecuted against said company : This agreement witnesses that the said assignment is made upon the following understanding, viz : Said A. B. Fuller is to employ attorneys and

counsel for the purpose of prosecuting said claim in the name of said Fullers, and without any liability on the part of said Follansbees to pay the expenses, or any part thereof. If no recovery is had the said Follansbees are not to make any claim against said Fullers, or either of them. But if the suit results in a judgment and recovery for the plaintiff, then said A. B. Fuller will pay to John S. and Eunice R. Follansbee one half of such sum as remains to him, after paying lawyers and other expenses. If said Fullers find it advisable to give up the attempt to prosecute the claim, then the right is reserved to re-assign the said claim to former holder, whereupon their liability under this agreement will then cease. [Signed] A. B. Fuller. New Haven, Conn., 1889.' 18. The defendant has never paid to said plaintiff Harriet A. Fuller, nor to said John S. Follansbee, or Eunice R. Follansbee any sum out of said class fund, or upon said reserve dividend plan, other than as above stated. 19. Neither the plaintiffs nor said John S. Follansbee or Eunice R. Follansbee have any knowledge or information by which they can state to this court who constituted the class formed in the year 1872; nor the amount of the policies belonging to said class; nor the amount of the premiums paid thereon; nor the amount of the dividends earned thereon; nor the amount or number of said policies that became lapsed during the period of said ten years; nor the amount of the reserve on any of the said policies; nor the several times when any of the said policies became lapsed; but all such knowledge is exclusively with the defendant, and is to be found on the books of the defendant whereon were kept entries concerning all such matters."

The plaintiffs claimed, by way of equitable relief, a cancellation of said receipts, an accounting and judgment for the amount found due thereon; and $100,000 damages.

The policy of insurance referred to in the first count, is as follows:

" METROPOLITAN

No. 27,523. $2,000.

AGE, 43. PREMIUM, $70.10.

LIFE INSURANCE COMPANY OF THE CITY OF NEW YORK.

" This policy witnesseth, that The Metropolitan Life Insurance Company in consideration of the representations made to them in the application for this policy, and of the sum of seventy dollars and ten cents, to them duly paid by the assured, Eunice R. Follansbee, of Bridgeport, in the County of Fairfield and State of Conn., and of the annual payment of a like amount to be paid on or before the first day of November in every year during the continuance of this policy, until she shall have paid ten full years' premiums, do insure the life of John S. Follansbee, of Bridgeport, in the County of Fairfield and State of Connecticut, in the amount of two thousand dollars for the term of ten years, ending with the first day of November, 1882. And the said company do hereby promise and agree that should the person whose life is hereby insured die previous to the date last mentioned the said amount shall be payable to the assured aforesaid, her executors, administrators, or assigns, in ninety days after due notice and satisfactory proof of the death of the said insured, the balance of the year's premiums, if any, being first deducted therefrom. And the said company do further agree that should the person whose life is hereby insured survive the full term of years hereinbefore described they will pay the owner of this policy the reserve endowment of the same, on the day following the date last mentioned, as calculated by the actuary of the said company, being the sum of three hundred and thirty-seven dollars and ninety-eight cents, provided the stipulations, terms, and conditions under which this policy is issued shall have been observed by the party whose life is hereby insured, and provided this policy shall have been maintained in full force and effect by the payment of all premiums falling due thereon, up to and including the date mentioned for the last payment thereof; otherwise, this agreement to become and be null, void, and of no effect. This policy is issued and accepted by the

assured upon the following express conditions and agreements : 1st. At the request of the assured this policy is issued upon the reserve dividend plan ; and the said company agree that should the premiums be paid as herein stipulated for ten full years from the date hereof, and that should the life insured survive said period of ten full years, that said company will pay to the owners of this policy at the expiration of said period of ten years its equitable proportion of the reserve dividend fund in cash, the same to be receipted for to said company. 2d. At the close of any reserve dividend period the owners of this policy have the option to continue it until matured by its terms, either for reserve dividend periods of five or ten years, or to receive its equitable proportion of said company's dividend surplus thereafter annually. 3d. The reserve dividend when declared upon this policy, if not withdrawn in cash, may be exhausted in payment of future premiums, either as a temporary or reserve annuity, or continued with said company as a fund, drawing the average rate of interest earned, against which to charge future premiums as they fall due. 4th. An equitable surrender value will be allowed in purchase of this policy only at such time as a dividend may be due and payable upon it by its terms. 5th. This policy shall not be entitled to any share in the dividend surplus of said company other than at such times and after the manner and upon the conditions as hereinbefore described in sections first and second of this paragraph. 6th. At the close of the period limiting the insurance under this policy the policy-holder has the option of continuing it for any further designated period, upon payment of the same premium, receiving a pledge of the increased endowment for such future period, providing said policy-holder shall furnish the company with satisfactory proof of health, and continue with said company the reserve endowment value hereinbefore specified. 7th. *Permission is hereby given* to the person whose life is insured at any time to make a voyage to Europe by steamer or a first-class packet ship, to travel while there in good conveyances, and to reside in any part thereof north of 42 degrees of north latitude, and west of 30 degrees east

longitude, and also to return in a like manner. It is however mutually understood and agreed that the said person is not insured against death in or by any war, or by any risk, casualty, or consequence of any war at or in any place where he may be while so traveling or residing: provided always that in case the said person whose life is insured as above shall at any time during the continuance of this policy without the consent of The Metropolitan Life Insurance Company previously obtained in writing sojourn or reside for a longer period than thirty days in any one year, commencing at the time of his arrival, in any part of the western hemisphere lying between the tropics, or of the eastern hemisphere, between the 36th parallel north and the tropic of Capricorn; or shall enter upon a voyage upon the high seas, except as hereinbefore mentioned; or shall be personally engaged in blasting, mining, submarine operations, or the production of highly inflammable or explosive substances; or in working or managing a steam engine, or a circular saw, in any capacity; or as a mariner, engineer, fireman, conductor, or laborer in any capacity, upon service on any sea, sound, inlet, river, lake, or railroad; or enter any military or naval service whatsoever (except into the militia when not in actual service), without the consent of this company previously given in writing, in each or either of the foregoing cases; or if he shall die by his own hand or act, or in, or in consequence of, a duel, or of the violation of the laws of any nation, state, or province; or if any of the statements or declarations made in the application for this policy, upon the faith of which this policy is issued, shall be found in any respect untrue, then, and in every such case, this policy shall be null and void. 8th. The said premiums shall be paid on or before the days above mentioned for the payment thereof at the office of the company in the city of New York (unless otherwise expressly agreed in writing), or to the company's agents, when they produce receipts signed by the president or secretary; and, in default thereof, then, in every such case, the company shall not be liable for the payment of the sum assured, or any part thereof, and this policy shall cease and

Fuller et Ux. *v.* Metropolitan Life Ins. Co.

determine. Nor shall this policy although delivered take effect or be in force until the whole amount of the first premium is actually paid in the lawful currency of this country. No officer or agent of this company has power or authority to deliver this policy until such actual payment, nor to waive the actual payment of said premium on the delivery of this policy. 9th. In every case when this policy shall cease and determine, or become or be null and void, all payments thereon shall be forfeited to this company. 10th. If this policy should be assigned or held as security written notice shall be given to the company, and due proof of interest produced with the proofs of death. 11th. This policy shall be incontestable for any errors or omissions contained in the application not affecting the age, health, or family history of the insured. 12th. Grace will be allowed on the payment of premiums on this policy of as many months (not exceeding six) as shall be equal to the number of complete years during which this policy shall have been in force, the policy-holder using these periods of grace being charged legal interest for such time.

" In witness whereof the said Metropolitan Life Insurance Company have by their president and secretary signed and delivered this contract at the City of New York, this twenty-sixth day of October, one thousand eight hundred and seventy-two.

" JOSEPH F. KNAPP, *President.*

" ROBT. A. GRANNISS, *Secretary.*

" Countersigned this 29th day of October, 1872.

" SHERWOOD STERLING, *Gen'l Agent.*

" Reserve Endowment, August, 1872.

" No person except the president or secretary of the company is authorized to make, alter, or discharge contracts, or to waive forfeitures."

On the back of the three policies referred to in counts 17, 19 and 27, there was printed an advertisement or notice containing regulations in respect to payment of premiums and obtaining permission to make a sea voyage, and also the fol-

lowing: " This policy is placed in the reserve dividend class of 1873–83, the credits to the fund of which shall be made at the close of each calendar year, until the completion of ten full years from the date hereof; such credits to be the total gains from the following sources, viz: 1st. The surplus overpayments on all policies surviving said class period. (*Note.* Overpayments of premiums arise from a larger rate of interest earned than anticipated in the premium charges, a lower ratio of mortality experienced than expected, and a lighter percentage of expenses than provided for in calculating the annual payments.) 2d. The surplus overpayments on all policies becoming a claim by death before the completion of said period. 3d. The surplus overpayments on all policies lapsing by their terms before the completion of said period. 4th. The total reserve on all policies lapsing before the completion of said period. (*Note.* The reserve shall be accumulated in all respects as for a whole life policy for a like amount of insurance as herewithin written, to be calculated on the assumptions adopted by the State insurance department for determining such values.) 5th. The interest upon such credits at the average rate earned by the company."

. The material parts of the judgment rendered for the defendant, are as follows: " The 'reserve dividend plan' treated those taking policies upon that plan during any calendar year as a class, and postponed the usual distribution of profits or surplus among such class mutual policy-holders to the end of an agreed initial tontine period, to wit, ten years from the date of the several policies, and then at the expiration of said ten year tontine period dividing among the several surviving and persisting owners, holders, and designees of the policies in the several classes, their equitable proportion of the class reserve dividend fund or divisible surplus; the policy-holders in any class dying or lapsing or forfeiting their policies during said tontine period of ten years thereby forfeiting their contingent share in any such divisible surplus or profit. At the end of such initial ten year tontine period the defendant paid in each instance to the several

policy-holders, owners, and designees of said policies, their equitable proportion of the class reserve dividend fund or divisible surplus, in cash, and in each instance wherein the insurance term mentioned in the policy was a ten year term, the defendant at the end of said ten years also paid to the said holders, owners, and designees of said several policies, the amount of said 'reserve endowment' in cash; and in those cases wherein the insurance term mentioned in the policy was for a longer term than ten years, the defendant upon the request of said several owners, holders, and designees of said policies, at the end of said ten years also paid to them, severally, an equitable surrender value for said policies in cash; and thereupon, in consideration of such payments of said 'reserve endowment' and such equitable proportion of the reserve dividend fund or divisible surplus and of said surrender value by the defendant to the said several owners, holders, and designees of said policies, said several owners, holders, and designees surrendered said policies to the defendant, and executed and delivered to said defendant a receipt in full, and release and discharge. . .

"The court also finds that the plaintiffs never were the equitable or *bona fide* holders or owners, and neither of them ever was or is the equitable and *bona fide* holder or owner, of any of the alleged choses in action which are the subject of this action.

"Whereupon it is considered, determined and adjudged that the said policy contracts were, severally, as above stated and found, and that the defendant has in each instance fully complied with and discharged the same, and that the plaintiffs and neither of them are, or ever were, the equitable or *bona fide* owners or holders of any such claimed chose or right of action against the defendant, and that in respect to the alleged causes of action stated in the said complaint the plaintiffs have no right or cause of action against the defendant."

In the finding the trial judge details the facts upon which the judgment is based, and among others he finds "as a matter of fact from the testimony and evidence in this case, that

before and at the date of the policies in question this 're-serve dividend plan' of insurance had the above meaning," *i. e.* that stated in the judgment. The finding also details at great length numerous rulings on evidence.

The appeal assigns error in the finding and rulings of.the court as to the meaning of the "reserve dividend plan," and a great number of errors in rulings upon evidence.

*Talcott H. Russell* and *George E. Beers*, with whom was *E. P. Arvine*, for the appellants (plaintiffs).

*Henry C. Robinson* and *Henry Stoddard*, for the appel-lee (defendant).

HAMERSLEY, J. In the years 1872, '73 and '74, the de-fendant issued a number of participating policies, providing for a dividend upon the policies of each year at the end of ten years. All were term, life and endowment policies for differing periods. Forty-one of these are mentioned in the complaint, one in each count. In the case of each policy mentioned the defendant, at the expiration of ten years from its date, paid the holder the amount promised as an endow-ment, or, where the policy was for a longer term than ten years, purchased the policy by the payment of its surrender value. The defendant also declared upon all these policies a dividend, and paid the amount to each holder. The as-sured and insured under each policy gave to the defendant a release acknowledging the receipt of the payments so made, " in full payment and settlement and discharge of all claims and demands whatsoever." After the policies had been sur-rendered and the amounts due upon them thus satisfied, the plaintiffs obtained from the former owners of the policies as-signments of all "claims, demands and causes of action" against the defendant; and relying upon these assignments have brought this action in their own names.

---

*It is impossible to give an adequate outline of the arguments con-tained in the extended briefs of counsel in the space that can be al-lotted to that purpose.

There is no claim that the defendant has violated any direct promise of the policy. The plaintiffs seek, and seek only, to revise the methods by which the defendant ascertained the dividend it could properly declare and did declare on these policies. For this purpose the plaintiffs have brought their complaint in equity, claiming, first, a cancellation of the receipts on the charge of fraud, and second, an account. It is not necessary to go into the questions as to the remedy by account, the necessity of fraud to set aside the receipts, the validity of the assignments to the plaintiffs, and other matters which have been discussed. The fundamental question is the meaning of the policy of insurance, and the decision of that should end this litigation. The plaintiffs' counsel rightly claims that the meaning of the reserve dividend plan is "really the sole contest."

Upon the trial much evidence, documentary and oral, was received to explain the meaning of the policy. The plaintiffs rightly claim that it is a question of law not to be concluded by any finding of fact; and we think its meaning upon the point in controversy clearly appears from its language, read in the light of those settled and commonly known principles of insurance of which we may take judicial notice.

Life insurance is protection given to one person against the damage he may suffer through the death of another. A mere wager on the accident of death is void. In mutual life insurance the protection is furnished by the premiums paid by policy-holders. The duration of any particular life is the merest chance; but the average duration of life from any particular age approaches mathematical certainty. Hence it is possible to calculate the sum which, paid annually by a large number of insured, will satisfy the insurance on those who may die each year. It is the yearly death claims which constitute the cost of insurance that the premiums must pay. This cost for a young man is small, but increases each year until it becomes very large. To avoid the necessity of an increasing premium a uniform premium is calculated, which furnishes at first much more than enough to pay the cost of insurance, and later on is entirely insufficient for that pur-

pose. So the portion of the premium not used for the early yearly cost is reserved for use when the premium will become insufficient; and is invested so that it may increase at compound interest. It follows that the portion of the premiums applied to pay the yearly cost gradually increases, and that the portion which has been reserved to make up the insufficiency of the premium to pay future cost increases with the aid of interest. The part of the premium intended to meet the cost of insurance, both current and future, is called the net premium; it is the sum paid yearly by each to furnish the stipulated protection for all. But the policy-holders must pay not only for the cost of insurance, but also for the expense of management; so to the net premium is added a sum deemed sufficient to pay expenses and provide for contingencies, which is called the loading. In this way the policy-holders pay the sum necessary for the cost of insurance and expense of management. The amount of the net premium is calculated upon the basis of certain tables of mortality and upon the assumption that the company will receive a certain rate of interest upon all its assets; and the amount of the loading is calculated upon a certain assumed rate of expense. Now it may happen that the rate of mortality experienced by the company is less, and the rate of interest actually received is greater, than that assumed, and that the ratio of actual expense is less. In such case the company has in reserve more than enough, with the anticipated annual premiums, to provide for future cost of insurance and management; it has a sum which is not needed for the purposes for which it was paid. This sum is called profits; it is in fact a surplus resulting from overpayments by policy-holders. This surplus is derived from money paid by the insured and received by the company for a particular purpose, i. e. providing for cost of insurance and expense of management. If not needed for that purpose, it should in equity be returned to the policy-holders. They do not, however, own it, or have any legal control over its distribution; part of it, indeed, is derived from contributions of policy-holders who are dead; but the equity is recognized and it is

the duty of the company, when a surplus is ascertained, to return such portion as it does not deem proper to keep as a guaranty fund, to the existing policy-holders in equitable (*i. e.* as nearly as practicable) proportion to their overpayments or contributions.   Such return of overpayments, whether in cash, or by application on future premiums, or by increase of the amount insured, is a dividend.   This is the meaning of " dividend," and the only meaning it has or can have in connection with mutual insurance.

The surplus may also be increased through the failure of some to continue their policies.   Where a policy thus lapses the company has in hand the accumulations of a portion of its premiums invested and held in reserve to supply the insufficiency of future premiums to pay future cost of insurance.   (The amount thus held in reserve depends on the judgment of the company in calculating its premiums and the condition of its business, but the statute treats the company as legally insolvent unless its whole reserve is at least equal in amount to the reserve value of all the policies calculated according to a rule established by law.   Some companies accumulate a reserve larger than that required by statute; none can have less and remain solvent.)   By a lapse the company loses the future premiums, and may lose in other ways ; but it is relieved from providing for future cost of insurance as to that policy and ordinarily, when the reserve fund is good, there is a considerable gain which may increase the surplus.   Formerly, whatever gain there was went to increase the surplus ; but latterly, in view of the fact that these overpayments are made to provide for future cost of insurance by a policy-holder who up to the time of lapse has theoretically paid his full share of the yearly cost and expenses, the equity of the lapsed policy-holder has prevailed over the equity of those who remain, and he is allowed an equitable portion of these overpayments, and this is called the surrender value of his policy.   When a policy lapses the portions of prior premiums invested and held in reserve can no longer be applied to the purpose for which they were made, and, to the extent of the net gain by the

lapse, become overpayments, and in equity should be returned to the holder of the lapsed policy, or to the surplus for the benefit of all. A dividend, therefore, is a distribution of existing overpayments resulting mainly from savings on the annual cost of insurance and expense of management, and in part from savings on the future cost of insurance, *i. e.* the net gain from lapsed policies.

The company is the absolute owner of its assets, and within the limits of honest dealing has complete control of the time and manner of declaring a dividend on its policies. This time and manner, however, may be controlled by law, by its charter, and by contract. But no contract can make a " dividend " anything but the return to policy-holders of funds derived from their premiums not used and not needed for the purpose for which they were paid. So no dividend can be made by a company until after a valuation of its assets and liabilities, showing an excess of assets over liabilities. Unless there is such excess of assets over liabilities, every payment in the company's hands is needed for the purpose for which it was made; there are no overpayments to be returned, and a dividend cannot legally be made. *De Peyster* v. *American Fire Ins. Co.*, 6 Paige Ch. 486, 488; *Scott* v. *Eagle Fire Co.*, 7 id. 198, 202 ; *Lexington Life, etc., Ins. Co.* v. *Page et al.*, 17 B. Monroe, 412, 440.

The policies in question insure a life for a term of years, and also agree to pay an endowment at the end of the term. The net premium for the life policy is calculated in one way and that for the endowment in another. A part of the net life premium is used to pay current cost of insurance, and a part is reserved for future cost. The whole net premium of the endowment is reserved to meet the final payment, there being no current cost of insurance. The endowment in these policies is fixed at such a sum that the life premium and endowment premium added together equal the premium for a whole life policy for the same amount of life insurance. The policies are participating, and contemplate the payment of an equitable surrender value in case of lapse. They make special provisions in respect to the distribution of the profits by

way of dividend; and this controversy turns on the meaning of those provisions. Let us examine them.

In the first place the policy-holders stipulate and the company agrees that the dividend surplus in which all the policies issued in that policy year may be entitled to share, shall be apportioned and paid in cash to the surviving and persisting policy-holders at the end of ten full years. This is clearly stated in the first and fifth clauses of the conditions contained in the policy. Second, each policy-holder, by the stipulation in clause four, foregoes his right to an equitable surrender value during the dividend period, so that in case his policy lapses, the whole amount of payments on that policy held by the company in reserve, remains in its hands. Third, each policy-holder stipulates, in clause five, that any share of the dividend surplus which his policy might be entitled to during the dividend period, shall be apportioned among the surviving and persisting policy-holders. The other conditions are not especially pertinent to the disputed question. This disposition of the surplus the policy calls " the reserve dividend plan; " and it calls the fund accumulated through these stipulations of the policy-holders, " the reserve dividend fund."

The practical effect of these provisions is patent. The policies of each year constitute a class by themselves, and their contributions must be treated separately so far as consistent with the necessities and obligations of mutual insurance, in order to give effect to the provisions. The policies in force at the end of ten years will be entitled to the whole dividend fund, which may have been fed not only by the annual overpayments on their own policies increased by compound interest, but also by the overpayments of those who have died, made up to the time of death, and of those whose policies have lapsed, and by overpayments of holders of lapsed policies to the fund held in reserve to meet the future cost of insurance. As these policies stipulate that they shall receive no surrender value during the dividend period, the whole reserve or unexpended portion of the premium remains in the hands of the company, and the gains upon a lapse are

not depleted, as in other cases, by payment of a surrender
value. And this practical effect of the policy stipulations is
advertised by the defendant in an indorsement printed on
the back of some of the policies, which states that the credits
to the reserve dividend will be, " the total gains from the
following sources, viz : 1. The surplus overpayments on all
policies surviving said class period. 2. The surplus over-
payments on all policies becoming a claim by death before
the completion of said period. 3. The surplus overpayments
on all policies lapsing by their terms before the completion
of said period. 4. The total reserve on all policies lapsing
before the completion of said period. 5. The interest upon
such credits at the average rate earned by the company."
Under the first item is a note explaining how overpayments
of premiums arise, i. e. from larger rate of interest, etc., but
excluding the gains from lapsed policies, which are contribu-
tory to the fund representing overpayments as truly as the
other matters named. The gains from lapsed policies are
left to be stated as a separate credit; this, because no sur-
render value is paid according to the stipulation of the poli-
cies ; so that upon lapse all payments made to provide for
future cost of insurance and held in reserve for that purpose,
remain in the hands of the company. The " gain from the
total reserve on all policies lapsing," is therefore deemed of
sufficient importance to be named as a separate credit, instead
of being included under gains from overpayments of pre-
miums, as it would have been except for the retention of
surrender values. And a note under item four explains how
the reserve, the whole of which remains in the hands of the
company upon a lapse as a possible source of gain, is accu-
mulated. The policy is a term life and endowment policy,
insuring life for one amount and an endowment for another ;
but the reserve will be accumulated " as for a whole life
policy for a like amount of insurance," calculated according
to the rule adopted by the State insurance department. The
total reserve on all lapsed policies is retained in the com-
pany's assets, and is a source of gain arising chiefly from the
stipulations respecting surrender values.

This advertisement is evidently framed for the purpose of presenting the practical effect of the policy in a way suggestive of the largest possibilities of gain. It is, however, another form of saying: " The premiums paid during ten years on all reserve dividend policies issued this year, will be improved at compound interest and applied to the payment of the cost of insurance and expenses of management chargeable to the policies ; and at the end of ten years the surplus on hand, after providing for the future cost of insurance on continuing policies, will be apportioned by way of cash dividend to the policies then in force."

This is the plain meaning of the policy, by which the obligations of the company and the rights of the insured must be determined. It is the only meaning consistent with the terms of the policy and the fundamental condition of mutual insurance, that dividends must be derived from overpayments of policy-holders and that there can be no dividend, annual or decennial, unless at the time there is a surplus in the hands of the company.

The plaintiffs claim a widely different meaning, viz : " That the usual dividends and the total reserves on lapsed policies should have been credited to a fund yearly, that this sum should have been kept at interest and not resorted to for losses, death claims or expenses, and that it should have been divided at the end of the reserve dividend period among the survivors of the class."

So far as this claim relates to bookkeeping only, it is immaterial. The company may change its methods of entries and computation at any time. The essential feature is in the plaintiffs' claim that the policies did not simply provide for a decennial dividend, but that the defendant promised to incur certain fixed liabilities, and at the end of ten years to divide the amount of those liabilities.

A yearly dividend has its advantages : an uncertain equitable interest in a fluctuating fund is converted into legal ownership of a definite sum. A decennial dividend has its advantages : the rapidly increasing surplus is an additional guaranty against adverse experience of one or more years,

and the share of the policy-holder accumulates at compound interest. But the advantages of the two dividends cannot be combined; the certain enjoyment of the annual is inconsistent with the uncertain possibilities of the decennial. A combination of immediate consumption with continued possession is impossible. The plaintiffs' claim that the company in providing for a decennial dividend promised to declare ten annual dividends, is baseless. It did not even *promise* a decennial dividend. Dividend implies surplus, and surplus is free; if mortgaged for liabilities it is not surplus. And the policy in express terms forbids an annual dividend. " This policy shall not be entitled to any share in the dividend surplus of said company other than at the expiration of ten full years from the date thereof." How is it possible to extract from these policies a promise to declare annual dividends, when every one of them explicitly excludes its right to any share in the surplus except at the end of ten years? It is true, however, that if the business of the company were prosperous during the ten years, the dividend then made would be equivalent to the usual dividends,— *i. e.* those that would have been made had annual dividends been provided for—kept at interest. Assuming that prosperity, the decennial dividend may properly be calculated in this way.

But the plaintiffs rely mainly on the other part of their claim, viz: that " the total reserves on lapsed policies should have been credited to a fund yearly; " meaning that the company promised that upon the lapsing of each policy during the dividend period, it would become the debtor of the class policy-holders for a sum equal to the reserve value of that policy, that it would pay compound interest upon this debt, and at the end of the period would pay over the whole amount. This claim is stated by the plaintiffs' counsel in various forms: " In no case (of lapse) did the obligation to keep up the reserve of the class policy-holder cease to be a liability of the company during the class period, only the payee was changed." And again: " Until it had provided for the payment of such reserves (including reserves on

lapsed policies) it had no surplus fund; having no surplus fund it could not declare dividends."

Such a contract as this is unheard of. It is impossible of execution. It cannot be found in the policy, and is inconsistent with the terms of the policy. Indeed the plaintiffs do not claim to find such a contract in the policy. Their claim is that it may be inferred from the contents of a certain canvassing pamphlet entitled " Key to the Reserve Dividend Plan," written by one Stewart for the exclusive use of the agents of the Widows & Orphans Benefit Life Ins. Co., and that the plan of insurance contained in the defendant's policy is set forth and expressed on pages 10 and 11 of said book, and as so expressed had been adopted by the defendant prior to the issue of the policies. The trial court has found as a fact that this pamphlet was not adopted by the defendant. It was prepared and published for the exclusive use of the agents of the Widows & Orphans Co., and at the time the first of the policies in suit was issued that company was transacting business through its own agents. The pamphlet, after the manner of insurance literature, attacks the defendant and other companies named, as incapable of carrying on this plan of insurance, and attacks the standing of the defendant and other companies named. It seems hardly credible that the defendant in issuing these policies as its own peculiar plan of insurance, should have sanctioned the distribution and use of such a pamphlet of another company.

The plaintiffs, however, claim that upon the special facts found the adoption of this pamphlet is a necessary conclusion of law. For the purpose of this decision we will assume that the plaintiffs' claim is correct, and that the defendant did authorize the use of this pamphlet as an explanation of the plan of insurance contained in its policies. It must be remembered, however, that a book of this kind is not the policy, but is simply explanatory of the policy; it must be read in connection with the terms of the policy, and when its language may be construed as consistent with those terms, a different and inconsistent construction cannot be given. We think any fair construction of this pamphlet *is* consistent

with the meaning of the policy as expressed in its language. It would be a waste of time to sift in detail the loose phraseology of this book covering some 120 pages, or to compare it with the language of companion books covering over 100 pages more, written by the same author, for the same purpose and at the same time, and clearly proper to be considered in ascertaining his meaning. The true meaning of the pamphlet appears with sufficient clearness in the extract from pages 10 and 11, on which the plaintiffs mainly rely. The author's comments on the Reserve Dividend Plan are contained in some thirty paragraphs placed under "catch" headings, without much reference to clearness or connection. Among these is "*A simple view of the reserve dividend plan.*" He says: "The company in issuing any policy guarantee two things: the amount insured according to its terms, and an equitable share in all the surplus and earnings. The amount insured they pay after it becomes a claim. The surplus they divide by way of a cash dividend at the end of every year." Here is a clear statement of the whole promise of the company in any policy. The death claim is a liability that must be paid. The dividend is an apportionment of surplus. This is true of the reserve policies as well as of all others. Wherein they differ is this: "The reserve policies, however, in forming a class, *stipulate among themselves* that all dividends allowed upon their policies for ten years, shall be retained by the company, invested at the average rate of interest obtained on their investments, and finally divided at the close of the ten years among the living members only." This stipulation is contained in the policy, as follows: "This policy shall not be entitled to any share in the dividend surplus of said company other than at" the end of ten years, when the dividend fund shall be divided among the policyholders then living. He goes on: "It is *further stipulated* that in case any member fails to keep his policy in force for the ten years he shall forfeit his reserve for the benefit of his class, which sum shall be kept at interest by the company and divided in like manner." This stipulation is contained in the policy, as follows: "An equitable surrender value

will be allowed in purchase of this policy only at such time as a dividend may be due and payable upon it by its terms." A policy-holder could stipulate to forego the surrender value of his policy, but whatever of reserve there may be beyond this goes upon a lapse, by force of the insurance contract, to the free assets of the company; yet practically by force of this stipulation the whole amount held in reserve goes to those assets. The phrase "forfeits his reserve," etc., is accurate enough for a "simple view." Mr. Stewart goes on: "It follows then (follows from the stipulations of the policy-holders) that for every class formed a fund will accumulate from five sources, as follows:" (stating the sources substantially as stated on the policies).

The significance of this language lies in the fact that a "dividend" is defined as an equitable share in all the surplus and earnings; that the reserve policies differ from others only by reason of the stipulations contained in the policies themselves, and that the fund for the reserve dividend accumulates in a special way only by reason of these stipulations. This accumulation is the same as that mentioned on the policies, namely "the total gains" from all sources. And the final conclusion of Stewart is: "It is plain, therefore, that the dividend to the existing members at the close of the class must be considerably larger than the dividend accumulating in the ordinary way." The dividend to the existing members, fed from the five sources named, is an equitable share of the surplus; in this respect precisely like the dividend accumulating in the ordinary way, the only difference being that the surplus is liable to be considerably larger. This language, in connection with that which goes before, is conclusive that the "reserve dividend" Stewart is talking about is a "dividend"—an equitable share of surplus—and not a payment. This fundamental assumption that the reserve dividend is a "dividend" implying surplus and derived only from profits, runs through the whole book and fixes its meaning. He starts with a statement that the plan is a division of "profits." He states that it "differs from all others in that it recognizes the sources whence the surplus

arises and returns to each contributor the exact amount contributed." Among these sources is the "gain from lapses," and it is "this surplus" which "is divided among the policy-holders in an equitable proportion." He calls special attention to the fact that this surplus accumulating for ten years serves as a sort of guaranty capital in addition to the re-insurance fund, and thus furnishes a "security beyond question" for the payment of the amounts insured. In the companion book, "Key to the Reserve Endowment Plan," he states that the reserve dividend is a "question of surplus, its accumulation and division;" and that "the reserve dividend is a question of profits only;" that the realization of profit depends on assumptions by way of estimate only; that the company does not guaranty profit and assumes no liability in respect to it. In the companion book prepared for the defendant, about the time it commenced this kind of insurance, he states the sources of the reserve dividend, as "the profits of favorable mortality, the savings in expense, the gain by interest and investments, and the profits from lapses." And in describing the characteristic provisions plainly expressed in the defendant's policy, he refers to their reserve dividend feature as "its guaranteed equitable participation in the company's surplus in periods elected by the policy-holder." The more carefully this book is examined, the more clearly this meaning appears. But it appears with sufficient certainty from the statements that are the foundation of "A simple view of the reserve dividend plan," on pages 10 and 11, viz.,—a dividend is an equitable share of surplus; the reserve policies contain certain stipulations between themselves, by which the share of those who die or whose policies lapse goes to increase the share of those who live and persist; the reserve dividend fund is the result of these stipulations; at the end of ten years a dividend, *i. e.* an apportionment of existing surplus, is made to existing policies. This is the substance of the whole book; the rest is ornamentation. There is some unfairness to the author, as well as a touch of the humorous, in treating a drummer's pamphlet which taxes the resources of fancy and exaggera-

tion in indiscriminate praise of a general scheme of insurance, as the responsible explanation of the terms of a written contract.

Stewart says the persisting policy-holders are entitled to share in a surplus; the plaintiffs claim they are entitled to the payment of a debt. Stewart says the company promised ·to distribute what it has; the plaintiffs claim a further promise to pay a sum it has not. Whether we read these policies by themselves, or in connection with the "Key to the Reserve Dividend Plan," as an authorized explanation, the result is the same. There is no foundation for the plaintiffs' claim; and upon our interpretation of the policies they cannot maintain this action.

There is another view of these contracts that may be material. All that distinguishes ordinary life insurance from a wagering contract, is the theory of protection against damage that may be suffered through another's death. This protection may be purchased by the insured in behalf of his own family, or of those he sees fit to make his beneficiaries; it may be purchased by one on his own account where he may suffer damage from another's death by reason of kinship, the relation of creditor, or other insurable interest. But when this element of protection is entirely eliminated, the insurance is a wager and the contract is void. *Cronin* v. *Vermont Life Ins. Co.*, Supreme Court of R. I., 40 Atl. Rep. 497. In the present case the policy-holders stipulate between themselves that the surrender value of each policy lapsing, which represents payments made in behalf of the beneficiary, shall go to benefit other policy-holders living at a certain time, who are total strangers to the policy and the insured. This is a mutual wager upon the chances of life. There is no conceivable element of protection. The sole purpose of the bet is personal profit. It is the risk of what is due to each in the case of a lapse, for the chance of winning what is due to others. It is correctly described by the plaintiffs' counsel as "the chance to speculate on his chances of surviving the other members." On this ground these policies were urged upon the public, by appeals to the gambling instinct,

claiming, as stated in the Stewart pamphlet, that "Risk is the condition of success." The only way of evading the invalidity of such a contract is by the claim that the policy-holders in fact wager nothing, that all payments of premiums belong to the company, including those applied to maintain a reserve, and the policy-holders are not entitled to any particular sum, but only to an equitable proportion of the excess of assets over liabilities at the time of dividend. We do not pass upon the sufficiency of this claim. But if the claim of the plaintiffs be true; if upon each lapse a sum equal in amount to the reserve value of the policy lapsing becomes a liability of the company which it must pay to the surviving policy-holders; then all doubt as to the gaming nature of the transaction vanishes. The pool thus created is composed of definite sums of money of which the company is stakeholder, under an agreement to divide these sums among the winners, who are to be determined by the chances of life. If, therefore, the plaintiffs could maintain their claim, the result would be the dismissal of their complaint. Courts of equity will not apportion the spoils of gamblers.

A number of assignments of error in rulings of the court are well taken. The most material occurred in the examination of experts, so-called. Mr. Whiting was asked in reference to the "Key to the Reserve Dividend Plan," being a book claimed as the defendant's authorized statement of the contract in dispute: "Is there anything in that book that requires, anything in that book, or in that plan of insurance, that requires that there should be constituted and set aside," etc.? In respect to the indorsement on some of the policies in suit, Mr. Whiting was asked: "I wish you would state a little at length your opinion in reference to that language, and the reasons which are at the bottom of it." And he was further asked, in reference to the indorsement, whether it was inconsistent with a printed statement of the defendant, in evidence, as to the accumulation of its dividend fund. Mr. Homans was asked in reference to the "Key to the Reserve Dividend Fund": "From what fund are the expenses

and death claims made payable by the terms of that book?"
And also: "Do you find anything in the text of that book,
or in the illustrative tables, that indicates the existence of
any general fund," etc.? He was asked the same questions
about the indorsement that were put to Mr. Whiting. All
these questions were admitted against the plaintiffs' objec-
tion, and exceptions were duly taken. Others of a similar
character, not necessary to detail, were admitted.

This testimony was inadmissible. The meaning and legal
effect of the policy and of the document claimed as referred to
by the policy, was a question of law for the court. Experts
may be called to define terms of art, to explain the principles
of their science, where such principles are necessary to be
understood, to state the condition and practice of their busi-
ness, when material; but not to instruct the court as to the
meaning of a contract. Sometimes a definition of a term or
explanation of a principle may be decisive of the meaning
of a document, but it is for the court to draw the conclusion;
the opinion of any one else is immaterial. Here opinions
were received as to the very point at issue in the case.

Ordinarily a new trial will not be granted on account of
errors, where it appears from the record that a new trial can-
not lawfully produce a different result. But this is a mat-
ter of discretion. In the present case the trial court seems
to have found the meaning of the policy as a fact inferred
from documentary and oral testimony. The opinions erro-
neously received from witnesses learned in insurance matters,
must have been given weight, possibly controlling weight,
in reaching the conclusion, which was the basis of the judg-
ment. Under the circumstances of this case a majority of
the court think our discretion should be exercised in setting
aside a judgment so reached.

In a former appeal in this case the defendant assigned 167
errors; in the present appeal the plaintiff assigns 326 errors.
There was no just ground in either appeal for such prolixity.

There is error and the judgment of the Superior Court is
set aside.

In this opinion TORRANCE and HALL, Js., concurred.

BALDWIN, J. (concurring in the judgment, but dissenting in part from the opinion). I cannot agree with the majority of the court in approving the construction given, by the judgment appealed from, to the contract contained in the policies in question.

The plaintiffs introduced in evidence a pamphlet entitled as follows:—

"New Plans of Insurance presented by the Metropolitan Life Insurance Company, 319 Broadway, New York, entitled Reserve Endowment and Reserve Dividend Plans, claiming advantages not hitherto offered. Originated and published by William P. Stewart, Actuary of the Metropolitan, and copyrighted by him in 1869.

"Entered according to Act of Congress in the year 1872 by the Metropolitan Life Insurance Company in the office of the Librarian of Congress at Washington."

It is found that William P. Stewart, prior to 1872 was the actuary of the Widows and Orphans Benefit Life Insurance Co., compiling and publishing while such, a pamphlet entitled a "Key to the Reserve Dividend Plan," etc., which was copyrighted in his name in 1871; and that in 1872 he became the actuary of the defendant under a contract by which he gave it the exclusive right until 1878 to use and practice the plan so copyrighted.

No other proof was offered that the defendant or any of its agents prepared the matter in the pamphlet of 1872, or had it copyrighted, except the fact of such copyright and the document itself. The plaintiffs asked the trial court to find as a fact that it was copyrighted by the company, and the refusal to comply with the request is assigned for error. It seems to me plain that it was error. *Hoyt* v. *Danbury*, 69 Conn. 341. The pamphlet served to throw light on a material point, and if its statements were indorsed and put forward by the defendant, they became thus entitled to great weight in determining the nature of the policy contracts in controversy. That it was copyrighted in the name of the defendant was *prima facie* evidence that it was so copyrighted by its authority, and there was nothing to abate from the force of that presumption.

I am therefore of opinion that the pamphlet should have been taken as a cotemporaneous explanation by the defendant of the meaning of certain terms of art, used in its policies, namely, "Reserve Dividend Plan," and "Reserve Dividend Fund."

Three of the policies in suit bear an indorsement which also states what is to be credited to this fund. As these policies, in other respects, are identical with all the rest, I think that each of the whole number should be construed as if it bore a similar indorsement.

From these sources of information, and others to which allusion is made in the preceding opinion, it seems to me that the contract of the defendant was not that found by the Superior Court.

The defendant was a stock company. Its capital in 1872 was $200,000; in 1883, $500,000. Its means for meeting its obligations were therefore not limited to its premium receipts and the accumulations from them. It offered insurance upon the "participating" plan, under which dividends are annually declared from the surplus of the year's operations, if any there be, payable to all policy-holders, in proportion to the premiums received from them. It also offered insurance upon the "Reserve Dividend Plan." This was to tontine a number of participating policies for a fixed term of years, and instead of paying over the dividends which might be declared upon them, reserve payment until the end of the term, crediting interest meanwhile on the sums so reserved. But this was not all. In the words of the copyrighted pamphlet of 1872:—

"On the reserve dividend and reserve endowment plans a fund will accumulate from five sources, as follows: First. From the ordinary dividends, as allowed by the company, accumulated upon existing policies. Second. From the accumulated dividends bequeathed to the class by dying members. Third. From the accumulated dividends forfeited to the class by retiring members. Fourth. From the reserve of all policies lapsing before the close of the class. Fifth. From the addition of compound interest. It follows,

then, that the existing members at the close of the class will get, besides receiving all the ordinary dividends earned by their policies, more or less from all the last four sources. It is plain, therefore, that the dividend to the existing members at the close of the class must be considerably larger than the dividends accumulated in the ordinary way."

One of the five sources of credit to the "Reserve Dividend Fund" was therefore "the reserve of all policies lapsing before the close of the class."

On a previous page of the same work we find another description of the "Reserve Dividend Plan," as follows:—

"The Reserve Dividend Plan contemplates the reserving for ten years of the usual dividends paid policy-holders annually, and then of dividing this sum equitably among the survivors. In the event of death during this period the full face of the policy is paid; in which case it has proved a productive investment to the extent of from 500 to 5,000 per cent of its cost. In the event of a policy-holder relinquishing his insurance, his reserve reverts to the surviving members."

In the indorsement on three of the policies, to which reference has been made, the credits to the reserve dividend fund are described as "gains from the following sources," and one of these sources is given as "The total reserve on all policies lapsing before the completion of said period."

I think that the tontine fund, under the plan thus stated by the defendant, was entitled to be credited either with the total amount of the legal reserve on all policies lapsing within the tontine period, or with such part of that amount as, in the fair judgment of the company, might properly be treated as surplus funds, not needed to strengthen its capital or otherwise to secure the performance of its obligations.

The "ordinary dividends allowed by the company," and paid or credited annually upon participating policies, came from such surplus as might remain, when, from the premiums accrued during the year upon all such policies, receipts of income from investments other than those representing the capital stock, and gains on sales of such investments,

there was deducted the amount of its current expenditures, together with the requisite additions to the reserve to be carried for each policy, less subtractions for reserves no longer necessary because the policies, against which they were held, had ceased to be in force. There would be included in its current expenditures whatever it might pay on matured policies, or for the surrender value of policies purchased. The total amount of the reserves on lapsed policies was thus a source of credit to the general surplus, out of which the usual annual dividends to policy-holders were payable. But these dividends in the aggregate were not necessarily or probably to equal the amount of that surplus. It might at the reasonable discretion of the company be drawn upon for dividends to stockholders, or for a permanent addition to the company's investments to strengthen its financial credit. It might also be drawn upon to satisfy special contracts with special classes of policy-holders who had been induced to insure themselves in a particular way by the promise of such a benefit.

Such was the case of the tontine policy-holders under the reserve dividend plan. They had agreed, in lieu of receiving the usual dividends every year, to have the sum to which these would amount remain in the hands of the company for ten years, during which it would serve, in favor of its creditors, including themselves, as a " guaranty capital " in addition to the regular re-insurance reserve fund required by law, as was stated in Stewart's original Key to the Reserve Dividend Plan. In consideration of this the company promised them whatever gain might accrue from lapses of any of the policies in their tontine. One gain accrued by chalking off from the list of the company's liabilities the reserve previously held for each lapsed policy ; for this left its amount a free asset, to be treated as such in computing the surplus available for dividends. But this cannot be what was intended by the separate specification of the total reserve on lapsed policies as an additional source of gain to those already described. The tontine policies were to have some benefit by these lapses besides that which was exhausted in

increasing the usual dividends, in which all participating policy-holders shared alike. The only other gain they could have would be by a credit either of the total amount of these reserves to the tontine fund, or of such portion of it as the company thought it equitable to allow. There is nothing singular or unfair in such an arrangement.

The "Reserve Endowment Plan," which was combined with the "Reserve Dividend Plan" in all the policies in controversy, ensured to each surviving policy-holder who kept his policy in force during the whole term of his insurance (which might be longer than the tontine term), the full amount of the reserve which ought to have been held against his policy, whether in fact the company had maintained it inviolate, or not. The sum insured upon his life, being no longer payable in any contingency, he might fairly stipulate to have the reserve returned, which had been or ought to have been kept to meet the contingency of his previous death.

So all the members of the tontine might fairly stipulate with the company and each other, that if any of them let his policy lapse, the reserve which had been or ought to have been held against it, being freed by the lapse, should forthwith go into the tontine fund. While in the fund, it would be an asset of the company *quoad* its creditors. At the end of the tontine, it would be payable to the tontine survivors, subject only to such rights of creditors, and to any statute requirements as to the maintenance of an adequate re-insurance reserve.

The Superior Court has found that the policy contract was that dividends to members of the tontine should be made only out of the receipts for premiums upon the tontine policies, improved at interest; and that there must first be deducted, among other things, all sums paid for insurance upon the lives of those of the class who had died, and any amounts paid to buy in any of the class policies. I find no such provisions in any of the documents in proof. On the contrary, in the Key to the Reserve Dividend Plan, Stewart expressly says that "the expenses and death claims are paid out of the general fund of the company, and not charged to the class

fund." Any other arrangement would violate the general principles of life insurance, which is only safe for either party when a large number of lives are at risk, so as to allow the doctrine of averages full play.

The Superior Court also denied the tontine fund any benefit from lapses, except that shared by all participating policyholders in the ascertainment of the surplus applicable to ordinary dividends. I think the policy, which, if obscure, should be construed against the defendant whose production it is, promised some addition to the fund, outside of its share in the usual dividends, from the reserves which were or ought to have been held against the lapsed policies; and that this proviso was valid and enforceable. In the preceding opinion of the court, it is said that if the undertaking were to account for the entire reserve, it would be a mere wager, and so void. To this I cannot agree. It seems to me a legitimate mode of reducing the cost of insurance to the survivors of the tontine, in the benefit of which all share alike at the inception of the contract, since the chances of life are then uncertain.

In my opinion, the total amount of the reserves belongs to the tontine fund, subject only to the rights of creditors or the provisions of statute law as to the necessary insurance reserve.

In Stewart's Key to the Reserve Dividend Plan, after explaining its right to the usual dividends, he says: "It is further stipulated that in case any member fails to keep his policy in force for the ten years he shall forfeit his reserve for the benefit of his class, which sum shall be kept at interest by the company, and divided in like manner." In his "Key to the Reserve Endowment Plan," he recurs to the subject of the "reserve dividend," and describes it thus: "The dividend is not a return at compound interest of the policyholder's own money, but the payment to him of his equitable share in the funds of the company. This share will include the contributions from lapsed dividends, reserves, and the dividends bequeathed by dying members." All this seems to me fundamentally inconsistent with the conclusions of the Superior Court, which were that the business of each

tontine was to be marshaled by itself, but that lapses in tontine policies benefited the tontine only as it benefited every participating policy-holder.

Considerable weight is attached by the majority of the court to the provision in every policy that "an equitable surrender value will be allowed in purchase of this policy only at such times as a dividend may be due and payable upon it by its terms." As dividends while they might become "due" annually were not to be "payable" until the end of the tontine term, this forbade the company to buy in any of the tontined policies prior to that event. Its object, as it strikes me, was not to express a promise to pay a surrender value, but to provide against wronging the tontine survivors by denying them the full benefit of any lapse. Each policy provides distinctly that "in every case when this policy shall cease and determine or become or be null and void, all payments thereon shall be forfeited to the company," and that if there be any default in the payment of premiums, it "shall cease and determine." A purchase, therefore, of one who contemplated dropping his insurance, was an act of mere grace. If he belonged to a tontine, it was better for the other members that his relations to them should be terminated by a lapse rather than a purchase. A purchase would prevent a lapse, and by giving the company some rights as his assignee, or as respects the purchase money paid, would complicate or disarrange the final settlement of the tontine account. On the other hand, if a purchase were made at the end of the term, the company simply would become the assignee of the vendor's right in the accumulated fund, whatever it was.

I concur in the opinion that in the admission of expert testimony to determine the construction of written documents there was error, for which a new trial should be granted.

ANDREWS, C. J. I concur in the result, and in the opinion written by JUDGE HAMERSLEY, that there was error in the admission of the expert testimony. I dissent from that part of his opinion which discusses the meaning of the policies. On that part of the case I agree with the views expressed by JUDGE BALDWIN.