## TOWN OF VALDEZ v. VALDEZ DOCK CO.

(Third Division.   Valdez.   November 29, 1915.)

No. 773.

1. MUNICIPAL CORPORATIONS ⬒59—POWERS.

Municipal corporations are created to aid the state government in the regulation and administration of local affairs. They have only such powers of government as are expressly granted them, or such as are necessary to carry into effect those that are granted. No powers can be implied, except such as are essential to the objects and purposes of the corporation as created and established.

2. ESTOPPEL ⬒62(4)—MUNICIPAL CORPORATIONS—WHARVES.

The defendant, without any express franchise to do so, erected a wharf across the tide flats on the side line of the town of Valdez, extended, in 1902, and has maintained it in repair and conducted business over it since that date. *Held*, the town is estopped to object to the presence and use of the dock and its approaches.

⬒See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Valdez Bay is about 12 miles in length and about 3 miles in width. It is entirely surrounded by high mountains rising precipitously from the water's edge except in a few places where some stream or valley between the mountains has formed a flat or gravel bar. Valdez is situated on such a flat, 3 or 4 miles in width and running back about 4 miles to the face of the Valdez Glacier. Lying along the water front of Valdez is a mud flat more than 1,500 feet from the mean high tide line out to deep water. At the outer edge of this mud flat, the water deepens abruptly, from ground exposed at extreme low tide to hundreds of feet in depth. So deep is the water that it, like many of the Pacific Coast ports, is difficult to secure anchorage in.

Valdez was first settled in 1898. On June 11, 1901, the town was incorporated by order of this court, under chapter 21 of the Civil Code of Alaska (Carter's Code). Owing to a mistake in the description of the boundaries, an order was made November 22, 1904, correcting said description, which last-named order was made as of date June 11, 1901. The corporate limit or boundary line of said town along the water front was established as meandering along the line of mean high tide.

Prior to February 7, 1914, the corporate limits of Valdez were extended over only about one-half of its present limits. At the date of incorporation (June 11, 1901) and according to the order incorporating the same, the northerly or westerly boundary thereof extended to a line about midway of what was then called Reservation avenue, now called Alaska avenue. All to the west or north of that line was covered by and occupied as a military cantonment or reservation. Military occupancy thereof, except a small portion reserved for public purposes, was withdrawn about July, 1902, and the residents of Valdez located, platted, and settled upon the same, laying out streets by common consent.

February 7, 1914, pursuant to an act of Congress giving power so to do, the corporate limits of said town were by order of this court enlarged and extended over said former reservation; the water front limit or boundary being established as before, to wit, along the meandered line of mean high tide.

The materiality of all this is shown by reason of the fact that the approach of the defendant's dock as originally constructed and as at present maintained, began at a point about

350 feet on the upper or landward side of said mean high tide line, and on said Alaska Avenue, at a time when said avenue or street was only 25 feet in width, and all that portion of said approach on the northerly or westerly side, or Reservation side, of said street or avenue, would not be in or in front of any portion of the town of Valdez in 1902 when said dock was so constructed. This situation is clearly shown on defendant's map, Exhibit No. 5.

Up to the year 1902, passengers to be landed at Valdez from ocean steamers coming from Seattle and other points, were taken on rowboats from the steamers, rowed as far towards town as the condition of the tide would permit, and then required to walk over the mud flat to dry land. Freight was placed in scows which were hauled to points on or over said mud flat where the receding tide would leave them, and teams would then drive down and unload so long as the condition of the tide would permit. The tides at this port vary in height from 10 to 14 feet. The population of Valdez fluctuates, being from 1,000 to 1,500 people.

Early in 1902 the defendant dock company, or its predecessors in interest, constructed the dock which is the subject of this controversy, although it can hardly be called the same dock, so much has it been repaired and added to. The long approach, over 1,500 feet in length, however, crossing said mud flat, is practically in the same position as constructed in 1902, except that since a disastrous fire occurring in Valdez on July 15, 1915, about 500 feet of the approach nearest to town which was burned has been reconstructed, at a slightly different angle, from the foot of Alaska avenue (formerly called Reservation avenue). No franchise was ever asked for from, or granted by, the common council of the town of Valdez to construct, operate, or maintain this wharf, and the dock company has at all times charged wharfage for freight handled or stored on said dock.

The defendant is a corporation organized under the laws of Alaska. Section 798, Comp. Laws Alaska 1913, provides for the formation of private corporations for the following purposes, among others:

"Subdivision 4. To construct and operate smelters, electric and other power and lighting plants, docks, wharves, elevators, warehouses and hotels in Alaska."

5 A.R.—26

Section 2569, Comp. Laws Alaska 1913, provides for an annual license of ten cents per ton on freight handled or stored on public docks, wharves, and storehouses.

Section 630, Comp. Laws Alaska 1913, provides that all license moneys collected by the clerk of the district court (license moneys provided for in said section 2569), within the limits of any incorporated town, shall be paid over to the treasurer of such town to be used for school and municipal purposes within the town.

The defendant has presumably paid this license tax for many years, which according to the testimony would amount in the last year to more than $400.

Some time in 1903 or 1904 the common council of Valdez granted a franchise to Geiger and McPhee to construct, maintain, and operate a wharf beginning at the foot of Keystone avenue in said town. Said wharf was thereupon constructed and maintained and operated, and wharfage charged for its use, until the 1st day of August, 1910, when the town of Valdez, by and through its regularly elected and acting authorities, purchased said wharf, and has ever since owned and operated the same.

On the 19th day of August, 1915, the common council of the town of Valdez passed Ordinance No. 90, which provided for harbor limits for said town, fixing rates of wharfage to be charged on the wharf owned by the town, and by section 4 thereof prohibiting any person or corporation from charging or collecting wharfage on freight landed within said harbor limits, which said limits cover the space occupied by the dock of defendant company.

October 27, 1915, defendant company was charged before the municipal magistrate of the town of Valdez with the violation of section 4 of said ordinance, in charging and collecting wharfage on its said dock and was convicted and fined $50, from which conviction an appeal was taken to this court. A jury was waived and the case tried before the court.

O. P. Hubbard, of Valdez, for plaintiff.

Donohoe & Dimond and Lyons & Ritchie, all of Valdez, for defendant.

BROWN, District Judge. Several questions were raised by the defendant by motion to set aside the complaint and by demurrer, both of which were overruled, in order that, if pos-

sible, the case might be presented on the merits, and all the facts concerning the situation put in the record.

First. Defendant denies the right of plaintiff to enact Ordinance No. 90, as exceeding its authority.

Second. That the town of Valdez is without authority to extend its jurisdiction beyond the exterior boundaries of the town.

Third. That said ordinance is illegal and void, as it is an attempt to confiscate vested private property without due compensation therefor.

The first of these goes to the right or power of the town council to establish harbor limits beyond its exterior boundary lines.

In Conradt v. Miller, 2 Alaska, 433, a case relied upon by plaintiff, it is said:

"Municipal corporations are created to aid the state government in the regulation and administration of local affairs. They have only such powers of government as are expressly granted them, or such as are necessary to carry into effect those that are granted. No powers can be implied, except such as are essential to the objects and purposes of the corporation as created and established. 1 Dill. Mun. Corp. (3d Ed.) § 89, and cases there cited. To the extent of their authority they can bind the people and the property subject to their regulation and governmental control by what they do, but beyond their corporate powers their acts are of no effect. * * * No matter how much authority there may be in the Legislature to grant a particular power, if the grant has not been made the city cannot act under it. Barnett v. Denison, 145 U. S. 135, 12 Sup. Ct. 819, 36 L. Ed. 652; Hill v. Memphis, 134 U. S. 198, 10 Sup. Ct. 562, 33 L. Ed. 887."

See, also, McQuillin, Municipal Corporations, § 353, where it is said:

"Any ambiguity or doubt arising out of the terms employed in the grant of power must be resolved against the corporation and in favor of the public."

The only powers conferred upon municipalities in Alaska referring to the subject in controversy are found in section 627, Comp. Laws Alaska 1913, which provides that the said common council shall have and exercise the following powers:

"Fourth. To provide for the location, construction, and maintenance of the necessary streets, alleys, crossings, sidewalks, sewers, and wharves. * * *

"Sixth. To provide for fire protection, water supply, lights, wharfage, public health, and police protection. * * *"

Upon the construction generally given such powers, it is at least a matter of grave doubt whether a town council in Alaska has any extraterritorial authority, and my attention has not been called to a case in point on this question, nor as to the right to establish harbor limits, outside the territorial limits, except where that power is expressly conferred by legislative enactment.

But upon the merits of the case, what is the situation? The plaintiff makes no concealment of the purpose it has, viz. that of obtaining revenue for the town from wharfage receipts; at least, this is the reason given by several of the councilmen who passed this ordinance.

In 1902, when the defendant's wharf and dock were constructed, the following section designates the powers in relation to the subject, to wit: Section 201 of the Civil Code of Alaska (Carter's Code, p. 394):

"The council shall have the following powers:

\*     \*     \*     \*     \*     \*     \*     \*     \*

"Fourth. By ordinance to provide for necessary street improvements, fire protection, water supply, lights, wharfage, sewerage. \*  \*  \*"

While this statute was in effect, and early in the year 1902, the wharf of the defendant was constructed to fill a pressing need of the town. It was impossible to build up a town and have to transport freight and passengers over the intervening 1,500 feet or more of mud flats between deep water and the upland. There is no evidence that the town at that time had funds with which to build a wharf; and such was, indeed, not the case. The very few people comprising the little town or settlement were willing to go to any length in order to secure a wharf, and a public subscription was started, many subscribing who could not and did not pay anything, and a few hundred dollars was raised to help out the work, which at that time was a very doubtful investment.

Between the years 1904 and 1910 another dock, at the foot of Keystone avenue, was operated by authority of the town council, and competition thereupon ensued. In 1910 the town council purchased said Keystone dock with a view to competing with the dock of defendant company, which may have been a very laudable purpose, and no doubt has resulted in cheapening the price of coal to the consumers, probably more than enough so to pay for the purchase by the town of said dock.

There is no evidence in this case from which it can be determined why the steamers do not land at the dock owned by the town.

The very evident purpose of this proceeding and the passage of said ordinance is, as some of the witnesses have expressed it; "to put the defendant out of business."

Now, the power and authority of any governmental body, whether municipality, county, state, or nation, cannot be so construed as to enable it to deprive any person of his property, without just compensation.

Plaintiff contends that the defendant has no rights whatever, and that the town council has no power to grant a franchise to enable any person or company to construct or maintain a wharf or dock. If this be true, it is probably also true that the defendant cannot have any greater rights without any franchise from the town council than it would have with one.

Plaintiff relies upon the case of Conradt v. Miller, 2 Alaska, 433. In that case, on page 440, the court says:

"In the absence of special affirmative legislation, an incorporated town in Alaska has no authority to grant a franchise to an individual or corporation which will authorize the grantee to take exclusive possession in perpetuity of a portion of the street and river bank of a navigable river, and erect wharves and warehouses thereon, and charge the public wharfage or toll for using it. Illinois Ry. Co. v. St. Louis, 2 Dill. 70, Fed. Cas. No. 7,007."

Now, let us consider this case a little: In the first place, it was an action by abutting owners to prevent the obstruction of a highway in front of their premises on the bank of the Tanana river. The council attempted to grant an exclusive and perpetual franchise to occupy the street and extend their structure in front of plaintiff's lots. In the case at bar, no property owner is complaining; but, on the contrary, every owner of land abutting defendant's dock approach testifies that, instead of its being an obstruction, it is a great benefit. The court says, at the bottom of page 438 (after citing the statute, subdivision 6 of section 627, Comp. Laws Alaska 1913, supra):

"Power to provide for the location, construction, and maintenance of the necessary wharves imposes upon the council a public duty, as well as the power to perform it. When it shall appear necessary to the council to provide these useful aids to commerce, it becomes their official duty to locate and determine where the wharf shall be built, to construct or build it, and thereafter to maintain it and keep it in repair."

Council for plaintiff argues that the town council must exercise these powers; but let us see. How many towns in Alaska have constructed or own their own water system, or lighting system, or sewerage system? It would no doubt be a most excellent thing if they did; no one can deny that. In this day and age any one who does not favor public ownership of public utilities is sadly behind the spirit of the times. But this is no reason for taking one's property away from him without compensation. What reason is there for saying that a town in Alaska cannot grant a franchise or license, as it may be called, reasonable in its terms, not exclusive in its character, and for a reasonable time, with provision for the town acquiring the property ultimately at a reasonable valuation, for electric lighting, for water system, for sewerage system? And, if for these, why not for wharfage? Do the people, coming together in a country of great inconvenience at the best, poor and struggling to build up a town, where they hope to live in peace, establish schools, and educate their children, have to forego the modern conveniences of electric lighting, water, and sewerage system, because the law says the council shall "provide" these things, and there is absolutely no money with which to provide them? Are the people bound by such a construction? Is the law made for the people, or are the people made for the law?

If they can make reasonable and necessary contracts for these things, are they still compelled to wade in mud up to their knees and suffer the expense, difficulty, and delay of having their freight hauled through almost impassable mud and water for a third of a mile, because the town has no funds with which to build a wharf?

It is not a question of a perpetual and exclusive franchise; of course the defendant has no such thing, and I would be the last one who would wish to see such a privilege given away, if it were possible to do so. It would be a great calamity if the defendant, or any one else, could acquire the right to have such a perpetual or exclusive franchise, and without any power of control or regulation as to rates.

Suppose, however, that in the first days of an Alaska town, some one had put in an electric light system or water system, or sewerage system, with or without the sanction of the town council; suppose such system had been used by every one, including the town itself as an entity, for over 13 years, had

paid taxes and increased its service, so that it had a property worth $40,000 or $50,000. Would it be fair or equitable for the town to then construct or acquire by purchase another such system, and pass an ordinance making it a penal offense to use the service of such company, and for the company to make any charge for its service? Would this not be confiscation of property without just compensation, and indeed absolute destruction of property, in violation of all constitutional principles?

In addition to any property rights the defendant has, the situation is shown to be that many valuable improvements, business houses, and other structures, have been erected adjacent to defendant's wharf; the town has been built largely with reference to the main artery or thoroughfare established by this public wharf and dock. If this wharf is suddenly closed, all of these other property owners will necessarily be greatly damaged; some of the buildings and improvements will be rendered nearly worthless, if not quite so. Surely a court of equity would feel compelled to intervene to prevent such an unreasonable and unconscionable act of destruction.

The defendant company has no perpetual franchise; it has no franchise at all; but it is in such a position as raises an equitable estoppel as against the town authorities to deal such a blow at the very business center of the town as is proposed.

McQuillin, Municipal Corporations, § 1622, says:

"As against the municipality, an express grant of the right to use the streets is not always necessary. Such a grant may be waived by the municipality, or the municipality may be estopped to object to the use of the streets on that ground."

See, also, section 1687, McQuillin, Mun. Corp. vol. 4.

In the case of City of Bradford v. N. Y. & P. Telephone & Telegraph Company, a Pennsylvania case reported in 206 Pa. at page 586, 56 Atl. at page 43, the court says:

"While the authorities with us are not numerous in holding that laches may be imputed to the commonwealth and municipalities in denying them equitable relief which might otherwise be granted, the rule that it can be imputed to the public is clearly laid down in several cases. 'Laches may be imputed to the commonwealth as well as to an individual.' Commonwealth ex rel. Attorney General v. Bala & Bryn Mawr Turnpike Co., 153 Pa. 47, 25 Atl. 1105. In Penna. R. R. Co. v. Montgomery Co. Pass. Ry. Co., 167 Pa. 62, 31 Atl. 468, 27 L. R. A. 766, 46 Am. St. Rep. 677, we said: 'But we know as matter of current history that street railways have been projected, and ac-

tually constructed, and are now in operation, over country roads. where no legal consent has been obtained, and where no attention has been paid to the rights of property holders. Such railways cannot now be torn up or enjoined, either by the township officers or at the instance of landowners along their routes. Where such enterprises have been allowed to proceed, and the expenditure of large sums of money has been permitted, it would be inequitable to correct at this time what was a mutual mistake under the influence of which these enterprises have been pushed to completion.' What was said in Attorney General v. Delaware & Bound Brook Railroad Co., 27 N. J. Eq. 1, in denying an injunction asked for by the state, may well be regarded as applicable to the facts in the present case: 'The work has been, from its commencement, a matter of public notoriety, and yet no action has been taken on the part of the state authorities, nor even any warning uttered by them against the work. The defendants have been permitted to make their immense expenditure upon their enterprise, in the confidence of their convictions that they possessed all requisite legislative authority, without even a word of protest or remonstrance. Under such circumstances, equity will refuse its aid, even to the state.' "

In the case at bar, the use of the street complained of by the town of Valdez, by its authorities, is not a burden, not a hindrance or an obstruction, nor even an unsightly thing, as telephone or telegraph poles may be, but is an important and valuable improvement and betterment of 350 feet of the lower end of the street used, and a carrying out of a public street or highway where none before existed, and where, if this ordinance of the town council could be sustained, it would simply mean the destruction and abandonment of a very valuable and necessary planked roadway, to no one's gain, and to the loss, not only to the defendant, but to the town itself, which would have to erect a new structure over exactly the same ground, before such projected street could be of any possible use. Surely the law does not require so senseless and wanton a destruction.

The defendant company has no vested right to unrestrained freedom of action, and to remain uncontrolled in its charges for wharfage. The power of Congress or of the territorial Legislature can surely be exercised to prevent any arrogant assumption of power on its part. This might have been done long ago; it can still be done. For many years Valdez suffered a great loss of revenue and inconvenience, by reason of the fact that the so-called reservation part of the town was not included within the city limits, and it suffered such inconven-

ience for many years before legislative action was finally taken, resulting in bringing said portion of the town within the corporate limits; and yet the town council did not attempt to take the law in its own hands, to pass ordinances declaring things it had no power or rightful authority to declare, to remedy the situation. What is needed is united action to secure needful and necessary and reasonable legislative relief in such matters.

An act can be passed by the Legislature of Alaska, empowering municipal corporations to extend their corporate limits to deep water, to establish harbor limits, to regulate and control the rates to be charged by private wharf companies, and to provide for condemning them by the municipality. But all of these powers must, and no doubt will, be exercised by the territorial Legislature with reason and moderation, and not in a spirit of destruction and confiscation.

Plaintiff cites a number of cases decided by the Supreme Court of the United States generally touching the powers of towns to regulate the stationing and landing of vessels, establishing harbor limits, etc. These are all cases arising over such rights and privileges on the banks of rivers like the Mississippi. Counsel for plaintiff states that Ordinance No. 90 was modeled somewhat after that mentioned in Packet Co. v. Catlettsburg, 105 U. S. page 559, 26 L. Ed. 1 et seq. The conditions there were so totally different that the case does not seem to be applicable. There, along the banks of the river, craft of all kinds sought to tie up to the bank, or to any landing place, wherever they pleased, within the corporate limits of the town. The town, having express legislative power over the subject, could, of course, enact an ordinance requiring landings at the places designated. The situation there is shown by the following from pages 562 and 563 of 105 U. S. (26 L. Ed. 1):

"The protection of the shore of the sea or bank of a river on which a town is situated is a necessity to the town, and the washing and crumbling of the bank from the agitation of the waters, made by the landing of large steamers, demand that such regulations should exist. Small vessels, without steam, rafts, flatboats, keelboats, loaded to their very utmost capacity, and liable to be sunk by the waves which accompany the landing of large steamboats, have the same right to land at the shore that steamers have, and they have a right to protection against their powerful competitors for trade. This can best be secured by appropriate regulations, prescribing places for the landing of each, and in some instances placing the matter under

the control of a wharfmaster or other officer, whose duty it shall be to look after it. * * * There is probably not a city or large town in the United States, situated on a navigable water, where ordinances, rules, and regulations like those of the town of Catlettsburg are not made and imposed by authority derived from state legislation, and the long acquiescence in this exercise of the power, and its absolute necessity, are arguments almost conclusive in favor of its rightful existence."

Here, not only is the legislative authority wanting, but the conditions are so dissimilar as to render the case inapplicable. On these river banks, a simple and inexpensive structure only, or none at all, was required for a river boat to tie up to; here a large and valuable structure, of great value and service to the town, has been maintained, under at least implied sanction of the law, for more than 13 years. Congress by the act of June 6, 1900 (31 Stat. 331, c. 786), provided for the payment of a certain amount per ton annually for license tax from public docks and wharves. It surely contemplated the construction and operation of such public utilities. As this license money or tax goes to the municipalities wherein such dock is maintained, what would be the use of providing for taxing a town wharf, only to return the money to the town? If wharves were not contemplated in towns where people congregate, where would they be needed? If a town in its early days, situated as is Valdez, had not money to provide a wharf, must it go without? It could never grow into much of a town without a wharf.

Congress in enacting section 798, Comp. Laws Alaska 1913, providing that private corporations might be lawfully formed to operate docks, wharves, etc., in Alaska, must have contemplated that such structures were necessary, and would be built under this authority. The defendant company is formed under this act. And if towns in Alaska have no power to license or even permit such corporations to build and operate wharves, we encounter a manifest inconsistency and absurdity in Congress expressly authorizing an act which the town council says cannot be done.

I have not attempted to discuss the legal question involved as to the right of defendant to maintain its approach and wharf in front of land owned by it, or by another who does not complain, bordering on the shore, which in this case is the line meandering the mean high tide line. The right of the defend-

ant so to do would furnish a further defense to the enforcement of said ordinance, but in view of the law as I understand it to be and as above set forth, it will not be necessary to determine the case upon that point.

It has been held by the Circuit Court of Appeals, in the Ninth Circuit, in the case of Dalton v. Hazelet, 182 Fed. 562, 105 C. C. A. 100, as follows:

"Where a homestead entry in Alaska was bordered on one side by the meanders of the tide waters of Orca Inlet, the entryman, as the owner of the upland, though acquiring no title to the shore or soil below high-water mark, was entitled to free and unobstructed access to the navigable water, and for that purpose to construct a wharf over such lands without interference by third persons claiming the right to use the shore."

In that case, while it appears that the building of the wharf was in front of a homestead, the facts show it to be in front of the town of Cordova, where the owner was building out for the very purpose of constructing a wharf similar to that of defendant in this case.

As before stated, the defendant may not have a perpetual or an exclusive franchise or license, or be uncontrolled in its right to charge wharfage rates; but such control must be exercised by due authority of law, and according to principles of justice and equity, and not be destruction or confiscation.

It follows from the foregoing opinion that the plaintiff's complaint will be dismissed.