THE CITY OF HARTFORD *vs.* THE CONNECTICUT
COMPANY.

*Third Judicial District, Bridgeport, October Term, 1927.

WHEELER, C. J., MALTBIE, HAINES, HINMAN and BANKS, Js.

The charter of the predecessor in title of the defendant street rail-
way company, as amended in 1862, authorized it to construct
and operate extensions of its railway, as public convenience
might require, over any of the highways in the city of Hart-
ford, provided that no such extension should be constructed
or operated without the consent of the common council of
Hartford and provided also that the grades and location of such
railways, branches and extensions should in all cases be subject
to the direction and approval of the common council. A
further amendment in 1893 subjected the charter "in all its
parts to the general laws relating to street railways and to
street railway companies" except as otherwise therein expressly
provided. Later in the same year, when the company was
operating about nine miles of horse railway and two of over-
head trolley in the plaintiff city, it petitioned and obtained
from the common council, by the so-called "Tucker grant,"
permission to add more than eleven miles of overhead trolley
upon certain conditions, one of which was its agreement to pay
the city two per cent of its annual gross receipts of fares re-
ceived within the city limits "until such time as the State law
shall be so changed as to provide that taxes of street railway
companies shall be paid locally instead of to the State, and in
case of such change in the law, the company shall pay annually
to the city any deficiency in the amount of said taxes from
the amount of said two per cent on the receipts as aforesaid."
This grant was accepted by the company in writing; subsequent
permission for further extensions of its lines was, on several
occasions, given and accepted upon the same terms; and the
payments so specified were annually made by the company
until 1924 when, following the refusal of the city to allow the
use of the one-man type of trolley car, it declined to make
further payments under the Tucker grant claiming for the first
time that they were in the nature of a tax and thus in contra-
vention of the statutory provision, existing in 1893, that the
State tax upon such companies should be "in lieu of all other

*Transferred from First Judicial District.

Hartford *v.* Connecticut Co.

taxes on its franchises, funded and floating debt and railroad property." *Held:*

1. That, by the amendment of 1862, the General Assembly, instead of itself designating the location of the company's lines and the conditions under which they should be operated, had delegated this power to the city as the agent of the State.

2. That, in the exercise of this sovereign power, the city could withhold entirely its consent to extensions of the company's lines, or could grant it upon any conditions, limitations, reservations or restrictions not in conflict with the general law or the company's charter.

3. That, aside from the question whether it was illegal as a tax, the exaction of a percentage of the gross receipts under the Tucker grant was not repugnant to the company's charter and provided a reasonable and equitable consideration for the use and occupancy of the city streets and the added burdens placed thereon by the tracks, poles, wires and greatly increased traffic.

4. That the company had failed to sustain the burden of proving the allegations of its second defense, viz., that the percentage provision was inequitable and illegal because it contemplated compensation not only for the lines authorized by the Tucker grant and those succeeding it, but also for those lines which had already been located and were in actual operation; and that until such proof had been made, it must be assumed that the parties intended the payments to be, as expressed in the grant itself, fair and lawful consideration for the new burdens and expenses to which the city would be annually subjected by the new extensions.

5. That the estimate by the parties of a fair equivalent for these burdens and expenses, as embodied in the percentage agreed upon, was, if voluntarily made, conclusive and beyond subsequent judicial control, however ill-founded it may have been.

6. That whether the payments were in the nature of a tax depended upon the interpretation of the agreement in the light of the surrounding circumstances and was thus a question of law.

7. That the payments did not have the attributes and characteristics of a tax, in the restricted or exact use of that term, since they did not represent a compulsory, proportional charge levied by the city upon the company's property for governmental purposes, but rather a contractual obligation voluntarily assumed; and that, therefore, the provision in question was not invalid as opposed to existing legislation regulating the taxation of street railway companies.

8. That the further provision in the grant for a reduction in percentage in the event that legislation should be "so changed as to provide that taxes of street railway companies shall be paid

·locally instead of to the State" was obviously intended to protect the company against impairment of its contract rights and, so construed, tended to strengthen the city's contention that the payments were not a tax.

9. That the Tucker grant was not *ultra vires* in the true sense of that term and, therefore, void *ab initio* so that the acts of either or both parties could not effectuate its purpose either by way of ratification or estoppel.

10. That the company, having voluntarily accepted the grant and exercised its privileges and benefits without question for twenty-eight years, and being now in a position where it desires and purposes to continue in the enjoyment of them, was estopped to claim that the single provision relating to its payments was beyond the power of the city to impose.

11. That records of hearings held before the plaintiff's board of street commissioners upon a petition by the company for permission to extend its lines, in which proposed payments of a percentage of the gross receipts were repeatedly referred to as a tax, were not admissible in evidence, first, because the petition antedated, and comprised no part of, the action which culminated in the Tucker grant, the hearings upon which were held before a special committee of the common council, and, second, because discussions and statements made in legislative hearings or debates are never admissible to prove legislative intent.

12. That idle street talk concerning the nature of the payments was likewise inadmissible.

13. That the city was entitled to an accounting of the company's gross receipts from fares since January, 1924, and to a recovery of all payments accruing under the Tucker grant subsequent to that date.

Argued November 3d, 1927—decided February 9th, 1928.

ACTION to secure specific performance of certain of the obligations of a contract, for an accounting, and for damages, brought to the Superior Court in Hartford County and tried to the court, *Jennings, J.;* judgment for the defendant, and appeal by the plaintiff. *Error; cause remanded with direction.*

The Hartford and Wethersfield Horse Railway Company by its charter, granted in 1859, was authorized to locate and complete a single or double railway from a point in a certain highway in Wethersfield over this highway to the city of Hartford and thence to such

point on Main Street in Hartford as its directors should designate, provided that such railway should not be constructed over these highways without the consent of the towns or common council of the city having charge of such highways. By an amendment to its charter in 1862, it was authorized to construct and operate extensions of its railway, as public convenience might require, over any of the other highways in the city of Hartford, provided that no such extension should be constructed or operated without the consent of the common council of Hartford, and provided also that the grades and location of such railways, branches and extensions should in all cases be subject to the direction and approval of the common council. The amendment further provided, in § 10, that "no such railway shall be constructed over any highway, or any part thereof, without the consent of the selectmen of the towns, or the common council of the city, having charge of such highways"; and so much of the first section of the original charter as provided that no such railway should be constructed over any highway without consent of the towns having charge of such highways was repealed. In 1864, the company was authorized to transfer to any company which has connection or is authorized to have connections with it, any part of its property or franchise, or to purchase any part of the property or franchises of the connecting company. In 1885, the company was authorized by the General Assembly to construct and operate a railway in Morgan Street in Hartford for a short distance. In 1888, the common council of Hartford gave to the Hartford and Wethersfield Horse Railway Company permission to operate a line of its railway 1.28 miles by electric motive power, and in 1891 to operate another line of its railway from State Street through Market Street to Morgan Street to East Hartford line for approxi-

mately one-half mile. Both of these lines were actually constructed and operated, and no percentage of the gross receipts from the operation of the same asked or demanded. In 1893, the General Assembly authorized this company to change its name to Hartford Street Railway Company, and to construct an additional line. Section 5 of this authorization provided: "Except as otherwise herein expressly provided, this charter shall be subject in all its parts to the general laws relating to street railways and street railway companies." On October 9th, 1893, this company presented to the mayor and common council its petition for their adoption of its plan to extend its lines over various designated streets and to change the motive power on all its lines in the city then operated by horses, to electricity. No final action was taken on this plan except to refer it, on January 8th, 1894, to a joint special committee. On March 19th, 1894, the resolution denominated the Tucker grant was passed by the common council. It granted, among other provisions, permission to the company to lay a number of tracks in named streets, and to operate all its lines by the overhead single trolley system, and provided that "the grants and privileges to equip as aforesaid are subject to all the conditions and limitations herein contained." The first was that the directors each year at a stated time should report under oath to the city clerk the amount of gross receipts of fares received within the city limits and should pay into the city treasury each year two per cent of its annual gross receipts of fares as evidenced by such report "until such time as the State law shall be so changed as to provide that taxes of street railway companies shall be paid locally instead of to the State; and in case of such change in the law, the company shall pay annually to the city any deficiency in the amount of said

taxes from the amount of said two per cent on the receipts as aforesaid." The Tucker grant was accepted by the railway company by its vote and further evidenced by an instrument dated March 27th, 1894, which, after reciting the action of the council, concludes as follows: "Now Therefore, for a valuable consideration by it received from said city, the said Hartford Street Railway Company hereby covenants and agrees with said city that, so long as it shall operate its cars on said tracks by said system, it will protect and save harmless the city from any and all loss, cost or damage of every kind, nature or description, including damage by electrical currents to underground pipes, which it may at any time suffer by reason of the erection, maintenance and operation of said system or any part thereof; said loss, cost and damage to be determined by the judgment of a court of competent jurisdiction." At the time of the acceptance of the Tucker grant the Hartford Street Railway Company was operating in Hartford 9.14 miles of line, disregarding double tracking, switches, etc., of which about 1.832 were operated by the overhead trolley system. The Tucker grant gave permission for 11.96 additional miles exclusive of double tracking, switches, etc., all of which was subsequently built. Subsequently and up to the date of this action the Hartford Street Railway Company, and its successor The Connecticut Company, many times petitioned the common council for its consent to the extension of these lines. Several of such extensions have been granted, but always subject to the provisions of the Tucker grant, and these have been constructed and are now operated by defendant under such consents. The Hartford Street Railway and its successor have reported, and paid to the city treasurer under the Tucker grant amounts ranging from 2%, or $6,048.23, on a gross

Hartford *v.* Connecticut Co.

amount for the year 1896 of $303,411.70, to 2%, or $53,641.33, on a gross amount for the year 1922 of $2,682,066. The amount of gross fares for 1923, was $2,470,880.43, and 2% of this, $49,417.61. In various debates in the common council the two per cent requirment in the Tucker grant was referred to as a tax.

Members of the board of street commissioners, on petitions presented to the common council and referred to joint committees of its members and members of the council for extension of its lines and their electrification early in 1893, in hearings held thereon, referred to the requirement to report and pay a percentage of the gross receipts as a tax and at one time as a license fee. At no hearing or debate was any expression used by anyone which could be construed to mean that this percentage payment was equitable compensation or contribution for the additional expense which would be incurred by the city by reason of the construction and operation of the company's lines when electrified.

The trial court found there has not been shown any additional expense caused the plaintiff by the presence of the tracks of the defendant and its predecessors in title by the operation of its cars over them or by the overhead trolley system; nor any expense of any kind to the plaintiff which could in any sense be called additional expense by the substitution of electricity in place of horses as a motive power. There are at present in the city limits twenty-seven hundred trolley poles along the street curbs. The space between the rails comprises twenty-eight per cent of the surface of the street on which the rails are laid. The company has kept the area between its tracks and two feet outside the rails in repair, and has paid each year for sweeping, cleaning and watering the portion of the street occupied by the railway, amounting to

$15,000 a year, and in addition has made the indemnity agreement before referred to.

There was not, so far as appeared, any computation made by anyone on behalf of either party which fixed two per cent of its gross receipts from railway operation as just and equitable compensation to the city for additional expense for which the city was then obligated or would be thereafter by reason of the railway, and the court finds that said two per cent was not, at the time the consent was given, figured as such equitable consideration, but, on the contrary, was a tax. The plaintiff would not have approved of the plan submitted by defendant's predecessor without the acceptance of the condition in the Tucker grant requiring defendant and its predecessor to pay a percentage of the receipts from the operation of their railway. The city refused to approve of defendant's petition to operate its lines in Hartford with the Birney one-man car, and thereupon defendant refused to report the gross receipts or pay plaintiff the two per cent under the Tucker grant.

The court reached the following conclusions: (a) That there was no consideration for the payment by the company of the two per cent, and it was not fixed by the common council as having any relation to equitable or fair reimbursement for any loss which would ensue to the city from the location, maintenance and operation of the railway. (b) That the provisions in the resolutions of the common council of March 24th, 1894, requiring the defendant and its predecessor to pay said two per cent are illegal and void. (c) That such illegality did not affect the approval by the common council of the plans of the defendant's predecessor filed by them in January, 1893, and the provisions should be stricken from the resolutions as illegal. (d) That the defendant and its predecessors

are not estopped by the acceptance of the resolutions and of the benefits thereunder and by the payments of said two per cent from 1894 to 1923, from claiming such illegality.

*W. Arthur Countryman, Jr.*, and *Arthur L. Shipman*, for the appellant (plaintiff).

*George D. Watrous* and *Joseph F. Berry*, for the appellee (defendant).

WHEELER, C. J.   We make correction of the finding as to a part of paragraph twenty-three and strike out a part of paragraph twenty-nine.   These changes in the finding appear in the statement of facts preceding the opinion.   Other corrections asked for are denied.

The defendant street railway's predecessor was operating upward of nine miles of horse railway and nearly two of overhead trolley, in the city of Hartford, when it petitioned the city for permission to operate upward of eleven miles of additional overhead trolley over other of the streets of the city.   Permission was given by the so-called Tucker grant upon defined terms, one of which provided that the railway should pay annually to the city two per cent of its gross annual receipts.   The Tucker grant was accepted by the railway by its vote and agreement of March 27th, 1894; in pursuance of which the railway has since paid to the city the two per cent provided for in the Tucker grant and agreement continuously through the year 1922 and in the intervening period many times obtained other grants upon the same condition, which in effect was each time a renewal of this agreement, but on and after January 14th, 1924, it has refused to make payment of the two per cent upon the claim that the agreement in this respect was illegal.

The city's right to maintain its action depends upon whether it had the right under its charter to make the agreement it did, or if it did not have this right whether the railway by its long course of conduct in making payment of the two per cent, is now estopped to challenge the validity of its agreement in this particular. The action taken by the city in making the Tucker grant, coupled with its acceptance by the vote and agreement of the railway, constituted an executed contract and created vested property interests. *Chicago* v. *Chicago & O. P. Elevated R. Co.,* 250 Ill. 486, 95 N. E. 456; McQuillin on Municipal Corporations (1st Ed.) §§121, 1672. The franchise under which the railway operates in the streets of Hartford came from the State. It might in the grant of its charter, without consulting the city, have designated the streets over which the railway should operate its lines, fixed their location and the conditions under which the tracks should be laid and the railway operated (*Central Railway & Electric Co.'s Appeal,* 67 Conn. 197, 209, 35 Atl. 32), or it might have delegated the duty of designating the streets, fixing the location of the tracks and the conditions attached to their location and operation to its agent, the city of Hartford. In either case the franchise of the railway would have come from the State. By the first method the State would have granted the right without committing the determination of these conditions to the municipality. Thus, in *Central Railway & Electric Co.'s Appeal,* 67 Conn. 197, 35 Atl. 32, the route was designated in the charter; in *Fair Haven & Westville R. Co.* v. *New Haven,* 74 Conn. 102, 49 Atl. 863, the railroad sought to double its existing single track lines; in *Waterbury* v. *Connecticut Ry. & Ltg. Co.,* 86 Conn. 180, 84 Atl. 723, the routes were all specified in the charter and the application asked for the adoption of electricity

as a motive power over existing lines. In the second of these methods the State would have conferred upon the municipality, as its agent, the right to represent it. Whatever the municipality should do in its grant to the railway would be the act of the State, so far as made within the power committed to it. *Ghee* v. *Northern Union Gas Co.*, 158 N. Y. 510, 53 N. E. 692; *Cleveland* v. *Cleveland City Ry. Co.*, 194 U. S. 517, 24 Sup. Ct. 756. The defendant railway's predecessor was, in 1859, granted by its charter the right to lay a single or double railway over and along a specified highway in Hartford and to such point in that highway as its directors should designate. By amendment in 1862, it was empowered to construct and operate over any of the other highways in Hartford such other railways as "public convenience may require; provided, however, that no such railways . . . shall in any case be constructed, built or operated without the consent of the common council . . . first had and obtained," etc. This amendment brought the defendant within the second of these methods. Since the amendment has remained to the date of this action unrepealed and unmodified, it is unquestioned that the railway could not have constructed or operated its lines in any of the streets of Hartford, except on the designated part of Main Street, without the consent of the common council of Hartford. The legislative intention is manifest. It has never abrogated the power thus vested in the city of Hartford. As a general rule street railway routes have been designated in the charters granted by our General Assembly; in the instant case the power of designation was committed to the common council. Within the exercise of its power of consent what were the limitations or conditions which the city of Hartford could attach to the grant of its consent? Obviously none

which conflicted with law, or with the charter granted to the railway by the General Assembly. *In re Kings County Elevated R. Co.,* 105 N. Y. 97, 13 N. E. 18. Beyond these limitations upon its power of consent the city might attach any other conditions or limitations which it chose. It represented in its every grant the State, and within the limitations imposed by law or by the State itself, its power was supreme, for it possessed, for the time, the sovereign power of the State. *Ashland* v. *Wheeler,* 88 Wis. 607, 60 N. W. 818; *Beekman* v. *Third Avenue R. Co.,* 153 N. Y. 144, 47 N. E. 277. McQuillin on Municipal Corporations (1st Ed.) §§121, 1644. "The right to consent to the use of the streets for street-railway purposes embraces necessarily the right to consent conditionally,—to consent with limitations, restrictions, and reservations. The city, of course, could withhold its consent entirely. There can be no doubt, therefore, of its right to withhold partially or to limit the grant." *Mercantile Trust & Deposit Co.* v. *Collins Park & B. R. Co.,* 101 Fed. 347, 351; *St. Louis & M. River R. Co.* v. *Kirkwood,* 159 Mo. 239, 60 S. W. 110; *Southern Pacific Co.* v. *Portland,* 227 U. S. 559, 33 Sup. Ct. 308; *Traverse City Gas Co.* v. *Traverse City,* 130 Mich. 17, 89 N. W. 574; *Minersville Borough* v. *Schuylkill Electric Ry. Co.,* 205 Pa. St. 394, 54 Atl. 1050; *Portsmouth* v. *Virginia Ry. & Power Co.,* 141 Va. 54, 126 S. E. 362. Provision for compensation as a condition of its grant of consent by the municipality was not repugnant to any provision of the charter granted the railway unless it were, in law, a tax. Defendant's charter made it subject to the statutes relating to railroads existing in 1848 with their amendments. These required of defendant, in 1893, the payment of a certain tax to the State which was stated to "be in lieu of all other taxes on its franchises, funded and floating debt, and railroad property

in this State." If the two per cent payment provided for in the Tucker grant was a tax it was repugnant to this law of 1893. We will take up this specific point at a later stage of this opinion.

So far as we can ascertain there is no other provision of the defendant railway's charter which conflicts with, or is inconsistent with, the two per cent provision. We have held a similar provision for the payment of a percentage of the gross receipts germane to the location of a railway upon a new street. "In deciding," we say, "whether to approve a railway location, all the natural consequences of the construction and operation of the road upon it must be taken into account. An electric railway in a city street must throw the main course of ordinary travel upon those parts of the highway which are not covered by its tracks. Such parts, being thus subjected to greater wear, . . . must often be improved or reconstructed, in order to be adequate to support the increase of burden, and this increase will be largely determined by the amount of business for which the tracks are used, and so, to a great degree proportioned to the gross receipts which such business yields." *Central Railway & Electric Co.'s Appeal,* 67 Conn. 197, 213, 35 Atl. 32. In *Providence* v. *Union R. Co.,* 12 R. I. 473, an action was brought to recover moneys due for the use of streets by a railway under an ordinance providing for compensation for such use which was conditioned upon the assent of the city and upon such terms and conditions as the city council might impose. In sustaining the action the court held: "But the power here conferred is not a mere police power. Evidently it was conferred, not only for the general good, but also to enable the city to protect itself as the body charged with the maintenance and repair of the streets, and it is to be construed fairly in view of its purposes. Rails

in streets are a serious annoyance; they divert travel to other streets, and so necessitate an increase of care and expense, not only where they are laid, but also in such other streets. It is therefore not unreasonable to require the companies to pay something for their privilege. The city, in giving its assent, has required it; and the companies, in accepting the assent, have agreed to comply with the requirement. We think the agreement binds them." In *Allegheny* v. *Millville, E. & S. Street Ry. Co.*, 159 Pa. St. 411, 28 Atl. 202, at page 416, the Supreme Court states: "A valuable franchise to use public property, the streets, for corporate profit, is about to be granted. It is not illegal or unreasonable that the public or the city which represents it should have a consideration for the privilege it confers." See also *Clinton* v. *Worcester Consolidated Street Ry. Co.*, 199 Mass. 279, 287, 85 N. E. 507; *Mitchell* v. *Dakota Central Telephone Co.*, 25 S. Dak. 409, 416, 127 N. W. 582; *Asbury Park & S. G. Ry. Co.* v. *Neptune Township,* 73 N. J. Eq. 323, 336, 67 Atl. 790; *Postal Tel. Cable Co.* v. *Newport,* 160 Ky. 244, 248, 169 S. W. 700; *St. Louis* v. *Western Union Tel. Co.,* 148 U. S. 92, 13 Sup. Ct. 485; *Western Union Tel. Co.* v. *Richmond,* 224 U. S. 160, 32 Sup. Ct. 449; *People ex rel. Jackson* v. *Suburban R. Co.,* 178 Ill. 594, 606, 53 N. E. 349; *Kinsman Street Ry. Co.* v. *Broadway & N. Street R. Co.,* 36 Ohio St. 239; 4 McQuillin on Municipal Corporations (1st Ed.) §1645. The use of these streets by the railway was nearly one third of their entire surface. The electrification of its railways added largely to the speed with which its cars were operated. The increase of its receipts within the period of these payments was eight-fold, indicating largely increased number of cars in operation and passengers carried. The use of the surface of these streets by the railway had thus largely increased within

this period. Its poles, twenty-seven hundred, stood at intervals of one hundred and twenty-five feet near the curb lines of these streets. It was therefore a reasonable provision that the city should receive a return for the use of its streets by the railway, quite apart from a return for the expense which may have been caused to it by the construction and operation of the railway over its streets. Where an ordinance of a city provided for the payment by a telephone company of $5 for each pole set in the streets of a city, the Supreme Court of the United States held: "It is more in the nature of a charge for the use of property belonging to the city—that which may properly be called rental." *St. Louis* v. *Western Union Tel. Co.*, 148 U. S. 92, 97, 13 Sup. Ct. 485. This construction of such a charge has since been approved by numerous authorities. No injustice was done the defendant railway by conditioning the grant to it upon the payment to the municipality of a consideration for the privilege. The terms of the municipal consent were not forced upon the railway. It could not compel the consent, but it could refuse to accept the terms offered.

The defendant is insistent in its claim that this case is governed by our decision in *Central Railway & Electric Co.'s Appeal,* 67 Conn. 197, 35 Atl. 32. Public Acts of 1893, Chapter 169, pp. 308, 312, provided that when a street railway is given a right to construct a railway, it shall present to local authorities a plan, which they may accept and adopt or modify, subject to the right of appeal to the Superior Court or a judge thereof, and it or he shall make such orders on appeal as may be deemed to be equitable and the decision of the court or judge shall be final. The street railway law of 1893 did not operate upon the defendant railway, or any other, until it had obtained from the local authorities the right to construct and operate

the line or lines it asked for.  The Central Railway
and Electric Company had constructed, under legis-
lative authority, a railway in the principal streets of
New Britain; thereafter it was given power to lay
tracks in thirty other streets and presented its plan
for the construction and operation of the railway in
three of these streets to the mayor and common coun-
cil who approved the plan subject to certain condi-
tions.  Upon appeal to a judge of the Superior Court
he held the condition providing for the payment to the
city of a percentage of the gross receipts "so long as it
should use . . . the streets . . . for railway purposes"
to be valid.  On appeal from his decision, we held
that the reason of appeal, that the judge ruled that
the railway's right to construct and operate its rail-
ways was dependent upon the consent of the city
authorities, was not well taken for the reason that the
judge had not so ruled, and further that the franchise
of the railway to construct and operate its railway in
these thirty streets had been granted to it by the ex-
press terms of its charter.

In the case before us, the right of the defendant to
construct and operate its railway in any except one
designated street could only be granted by the con-
sent of the authorities of the city of Hartford.  This
is a vital distinction between that case and this.  We
have already quoted from that opinion our holding
that a condition requiring the payment by a railway
to a municipality of a percentage of the gross receipts
for the privilege of constructing and operating its
railway over the streets of the city in which the de-
fendant had not theretofore granted its consent to
operate was a legitimate condition to attach to the
granting of such a privilege.  In the *New Britain* case
we held the condition requiring such a percentage il-
legal because it appeared that the payments were re-

quired as a compensation for the expenses chargeable to the city in consequence of the operation of the entire railway system, the greater part of which was in use when the privilege was granted, and which the city had no right to make the subject of a new condition requiring the payment for the expense caused by the railway in the streets which it already possessed the right to operate in. We were careful to point out that the city authorities might have based the payments for the location of the railway upon the new streets upon a percentage of the gross receipts which would be a fair equivalent of the expense the city would be put to by reason of the construction and operation of the railway in the new streets. The computation measured by a percentage of the total gross receipts of the entire system would be merely a convenient method of determining the fair expense to the city. "It is not impossible," the opinion states on page 215, "that the city authorities acted upon the view that the mileage of the tracks that it was planned to lay in Chestnut, East and Jubilee streets, would bear such a proportion to the total mileage of the company's system, that the specified percentages of the entire gross receipts from the operation of that system (measuring as they must, to a large extent, the business done upon it, from time to time), would be only a fair equivalent for the new expenses to which the city would be annually subjected, in the maintenance and reparation of these three streets, when the railway should be in use upon them. If it were clear that the order meant this, or if a fixed sum had been assessed as such an equivalent, we should think there was no error." The *New Britain* case is thus plainly distinguishable in its facts from this case, but its holding that the municipality could charge a percentage of the gross receipts of a railway as equitable

consideration for the privilege granted by it to a public utility supports the plaintiff's position.

The defendant sets up in its second defense that its contract with the plaintiff was *ultra vires* because the provision for the payment of two per cent of the gross receipts was not based upon any equitable compensation for injuries arising from the location and operation of its railway, and included earnings from lines already in operation. The burden of proving this defense was on the defendant. A reading of the finding indicates that it has not met this burden. Paragraphs thirty and thirty-four of the finding show that the trial court was of the opinion that it was necessary for the plaintiff to prove that it had been put to additional expense by reason of the construction and operation of the railway in the streets in which its lines were then operating and that computation made at the time of the Tucker grant fixed the computation of two per cent of the gross receipts as just and equitable compensation. There was no such obligation upon the plaintiff. It could stand upon its contract until the defendant established some or all of the grounds of the second defense. It is true the court finds that there were no expenses incurred by the city through the construction and operation of this railway. If this finding was made as a result of misplacing the burden of proof upon the plaintiff it cannot stand. It finds questionable support in the evidence. And it appears to conflict with the findings that there had not been shown any additional expense. Failure to prove a fact cannot be made the basis of a positive finding regarding that fact. There is no finding that the two per cent of the gross receipts was imposed to provide compensation to the city for expenses caused it thereafter by the operation of the railway over the streets in which it was operating its lines prior to the

Tucker grant. We cannot assume this to be the fact. The locations sought were about equal in mileage to those already granted, while the contract as to each grant recited that it was made upon a valuable consideration. In the *New Britain* case, the court held that the city had no right to require an annual percentage of the gross receipts from the lines already in operation and that "the most natural construction of the finding, however, would seem to be that which makes it uphold the imposition of this condition on the ground that it would provide a just compensation for such expenses as the city might thereafter incur for the maintenance of all the streets through which cars are run."

In the absence of a similar finding, we cannot hold, upon the record in the instant case, that the parties to the contract intended to include in the payments of two per cent of the gross receipts provided for, compensation on account of expenses caused by the lines already in operation. The fact that many similar grants of consent have been made to defendant to operate its lines in other streets since the decision in *Central Railway & Electric Co.'s Appeal, supra,* in 1896, and at no time has defendant protested these payments, is strong confirmation of the existence in the minds of defendant's advisers of the distinction between the grant made in the *New Britain* case and those made to the defendant which we have pointed out. The court could hold upon the record in the *New Britain* case that the percentage of the gross receipts provided for included compensation for expenses caused the city by the railway from its lines already in operation, and for which it had no legal right to condition its consent. In the instant case, we cannot hold that the percentage agreed upon did in fact include compensation for expenses caused by the lines

already in operation. We may not assume that the parties to the Tucker grant intended such illegal compensation. It seems the more probable interpretation that the percentage agreed upon was the estimate which the city deemed a fair equivalent for the new expenses to which it would be annually subjected by the operation of the new lines, together with a fair equivalent for the uses the railway made of all of plaintiff's streets over which it operated in the city of Hartford in the conduct of its private business, in which estimate the defendant acquiesced. The defendant assumes that unless plaintiff shows that it has incurred expense as a consequence of the construction and operation of the railway this provision of the contract must fall. That is a misconception. The parties to the contract, we must assume, thought as they expressed, that there was a valuable consideration for the contract, either in the expense to be incurred by the plaintiff, or in compensation for use of these streets, or in both. The fact that either of these considerations which they assumed and estimated, later failed to measure to their then judgment does not subsequently furnish either party ground for avoiding the obligation of the agreement entered into. The parties had the right to make their own estimate of the consideration for the plaintiff's grant of consent. Their estimate may have been good or bad; if voluntarily made it is beyond the control of a court.

The defendant cannot escape the obligations arising from the contract it voluntarily entered into with the city of Hartford unless the contract was *ultra vires*. It makes this contention upon the authority of *Central Railway & Electric Co.'s Appeal, supra,* which we have discussed, and upon the contention that the provision of the contract for the payment of the two per cent of the gross receipts is a tax. The city of Hart-

ford concedes that if this provision were a tax within the meaning of § 3920 of the Revision of 1888, it would be an illegal requirement, but it contends that if illegal when made, the defendant's twenty-seven annual payments made under the contract which it accepted and carried out for twenty-eight years estopped it from then repudiating the obligation of continuing these payments. We do not stop to consider whether, if the provision were not *ultra vires*, but was confiscatory or unreasonable in character, the defendant could avoid making these payments, as some authorities seem to hold, for these claims are not made in the record, or in the argument or brief of the defendant.

The trial court has found as a fact that this payment is a tax, and also found as a conclusion from the subordinate facts that the payment is a tax. Whether the provision in question in this contract was a tax or not must be determined upon the proper construction to be given to the language of this provision of the contract construed in the light of the circumstances surrounding its making. A question of that character is one of law and not of fact. *Fuller* v. *Metropolitan Life Ins. Co.*, 70 Conn. 647, 663, 41 Atl. 4. "It was, after all, the legal reading and interpretation of what was written." *Jordan, Marsh & Co.* v. *Patterson*, 67 Conn. 473, 479, 35 Atl. 521. The conclusion drawn from the subordinate facts, if erroneous, "is an error of law, and reviewable by us." *Neff* v. *Neff*, 96 Conn. 273, 275, 114 Atl. 126. A tax is a burden or charge levied upon persons or property by governmental authority for governmental or public purposes. *Loan Association* v. *Topeka*, 87 U. S. (20 Wall.) 655, 664. "A tax is not a debt in the ordinary sense of that term. It does not rest upon contract, either expressed or implied. It does not carry interest, and is not subject to set-off unless expressly so made by statute.

Neither its existence, nor its continuance, depends upon individual will." *Cromwell* v. *Savage,* 85 Conn. 376, 377, 82 Atl. 972. The defendant railway sought from the plaintiff the privilege of constructing and operating additional tracks over its streets, and the right under the law of 1893 to change its motive power to electricity on all of its lines. The law of 1893 did not affect the right of the city of Hartford to grant or withhold its consent to construct and operate the additional lines. The city voted to grant defendant's application upon its agreeing to the specified conditions in the grant, one of which was the payment of the two per cent of the gross receipts annually. The court finds that "the plaintiff would not have approved of the plan submitted by the defendant's predecessor in title without the acceptance of the condition in the Tucker grant relative to the payment to the plaintiff of a percentage of the receipts of defendant and its predecessor from its operations under said plan." The defendant's application had been pending a long time, its present counsel now say that it may be that defendant was then advised that the two per cent payment was legal, and we may safely assume that they are correct in their surmise. The contract was one which defendant undoubtedly felt was of advantage to it, and one which it had long considered. It could not secure the consent of the plaintiff unless it acceded to the proposed terms. It weighed the offer and deemed it of value to it; its directors unanimously accepted the grant and instructed its secretary to give the notice of acceptance as required by the terms of the grant, which he did. There was thus a valuable consideration to each of the parties to the contract. The city received the specified payment; the railway obtained the primary right to use a part of these streets for the purposes of its business. It was entirely op-

tional with the defendant whether to accept the grant upon these terms, or refuse it. We repeat, upon its acceptance the agreement became complete and the contract executed. The payment provided for was not a charge levied by government upon defendant's property for governmental purposes but the payment of an obligation created by its voluntary action. The provision for payment of a percentage of the gross receipts does not fall within any known definition of a tax; it is neither proportional nor compulsory in character, but voluntary and individual, and its every attribute is antagonistic to the normal attributes of a tax. Payments such as these are sometimes spoken of as taxes both in current speech, in statutes, and in judicial decisions; it is neither surprising nor significant to find that the payments in controversy, in current speech, have been designated as taxes. We must look, not for the current but the legal meaning of tax, that is, for the restricted or exact use of this word, and we cannot find it in the nature or characteristics of these payments. That is the true test. *Heerwagen* v. *Crosstown Street Ry. Co.*, 179 N. Y. 99, 103, 71 N. E. 729; *Memphis* v. *Postal Tel. Cable Co.*, 145 Fed. 602, 606; 37 Cyc. 707, 708. The authorities are in practical agreement in holding that a provision in statute, ordinance or contract affecting a municipality and public utility similar to the two per cent payment in the contract before us, is not a tax. It is designated as rental and not a tax in *St. Louis* v. *Western Union Tel. Co.*, 148 U. S. 92, 13 Sup. Ct. 485. Later, where franchises were granted to a street railway subject to the payment of a percentage of gross receipts, or of a lump sum, it was held that payments of this character are not to be construed as an equivalent or substitute for taxes. *Metropolitan Street Ry. Co.* v. *New York*, 199 U. S. 1, 25 Sup. Ct. 705. In *Denver* v. *Stenger*, 295 Fed. 809,

812, the Circuit Court of Appeals had occasion to construe a provision in the grant of a franchise providing for the payment, in further consideration for the franchise, of $5,000 per month during the twenty-year term of the franchise, in the light of the claim by the utility that the payment was a tax or in the nature of a tax. "It seems unchallenged," says the court, "that, at all times here material, the appellant possessed the power to deny the privilege of special use of its streets or to grant such under terms and compensations agreeable to it; also, that it possessed the further power to tax the exercise of such privilege. The former is a police power and compensation therefor is in the nature of rental. . . . The latter is a revenue power and exactions thereunder are taxes. . . . The obligation to make these payments is purely contractual. The voluntary nature thereof is not affected by the fact that one of the advantages inducing assumption of it was freedom from car license taxes. Being voluntary in origin it cannot be a tax. . . . The contention that the payments are operating charges in the nature of rental seems sound. That this character of charge is in the nature of rental has been determined by the Supreme Court. *St. Louis* v. *Western Union Tel. Co.*, 148 U. S. 92 [13 Sup. St. 485]." A county imposed payment of a percentage of gross receipts upon a light and power company for the use of highways. The court held: "The percentage payment is not a tax upon the property of the corporation, nor a license charge for the privilege of operating its business. It is a compensation for the use of the portions of the highway covered by the franchise easement, and it is limited to such percentage of the total gross receipts as can be shown to have arisen from the use of the franchise." *Tulare* v. *Dinuba*, 188 Cal. 664, 674,

206 Pac. 983; *Hanford Gas & Power Co.* v. *Hanford,* 163 Cal. 108, 111, 124 Pac. 727.

The defendant interprets the provision in the Tucker grant for the payment of the two per cent, "until such time as the State law shall be so changed as to provide that taxes of street railway companies shall be paid locally instead of to the State; and in case of such change in the law, the company shall pay annually to the city any deficiency in the amount of said taxes from the amount of said two per cent on the receipts as aforesaid," as supporting its claim that this payment is a tax. The plaintiff interprets this provision as intended to point out the difference between the two per cent payment and a tax, and also to furnish the defendant protection against a larger payment for the privilege granted it in the event that the taxation of defendant by the State should be changed. The plaintiff's interpretation is the more apparent one and the more reasonable. The Tucker grant protected the rights of the defendant as well as those of the plaintiff against the impairment of the contract rights each obtained. We have instanced a few of the cases where the rights of the municipality were given constitutional protection. We cite similarly a few cases where the rights of the public utility have been accorded a like protection. *Detroit* v. *Detroit Citizens Street Ry. Co.,* 184 U. S. 368, 22 Sup. Ct. 410; *Cleveland* v. *Cleveland Electric Ry. Co.,* 201 U. S. 529, 26 Sup. Ct. 513; *Knoxville Water Co.* v. *Knoxville,* 189 U. S. 434, 23 Sup. Ct. 531; *Amesbury* v. *Citizens Electric Street Ry. Co.,* 199 Mass. 394, 85 N. E. 419. *Central Railway & Electric Co.'s Appeal, supra,* at page 221, is in harmony with the law of our country and conclusively determines that the two per cent payment provision is not a tax but a contractual obligation voluntarily assumed which became effective when the railway was con-

structed and in operation. "To ask for equitable compensation," we say, at page 222, "for injuries occasioned by the location is something very different from laying a tax, or charging a license fee. There can be no obligation to pay, unless the tracks are laid; and it will then be merely a contractual obligation, voluntarily assumed, to make good a loss that would otherwise ensue to the municipality from their location." The contract of these parties must be held valid until the contrary appears. In its second defense defendant pleads the invalidity of this provision of the contract upon these two grounds; both of which were sustained by the trial court. We are unable under the law, as we find it, to sustain the judgment upon either of these grounds, or upon any other ground apparent in the record. The conclusions reached would perhaps justify our failure to pass upon the issue of the estoppel of defendant raised by the plaintiff's reply. Its conclusiveness in supporting plaintiff's appeal and the large consideration counsel have given it, lead us to state with some brevity our view of it.

Assuming defendant is right in its claim that plaintiff was without power to impose as a condition of its grant to the defendant the payment of the percentage of its gross receipts which defendant agreed to make, the plaintiff maintains that the defendant is estopped after this long exercise of the privileges of the grant to it, to avoid the making of these payments which it had made, without protest, for twenty-eight years, while it continues to exercise under claim of right the privilege of franchises granted in 1894, and in many other grants of like character and upon like terms. Defendant's claim of *ultra vires* ignores the true legal construction of that term as applied to a contract. The contract of a municipality which is not within the powers conferred upon it is *ultra vires,* that is, void

*ab initio,* and the act of one or both parties to the contract cannot give it life either by way of ratification or estoppel. 4 Dillon on Municipal Corporations (5th Ed.) §§1610, 1611; *Central Transportation Co.* v. *Pullman's Palace Car Co.,* 139 U. S. 24, 48, 49, 11 Sup. Ct. 478; 3 McQuillin on Municipal Corporations (1st Ed.) § 1172. "An act is *ultra vires* of a corporation," we say in *Byrne* v. *Schuyler Electric Mfg. Co.,* 65 Conn. 336, 346, 31 Atl. 833, "when it is not within the power of the corporation to perform it." The Tucker grant contract was not made in express violation of law. Defendant does not and could not claim that. Its entire subject-matter was within the power of the municipality, unless the single provision of the contract is void; the rest of the contract it does not attack but admits to be valid. It has not offered to abandon the rights it acquired under the contract; it desires and purposes to continue in the exercise of all the rights accorded it under the contract. The benefits to it arising out of this franchise, which we must assume was of prospective value to it when granted, and has since become and is now of real value to it, it retains but refuses to longer pay the primary pecuniary benefit to the plaintiff which it agreed to give in consideration of its consenting to the grant. Private individuals or corporations would not be permitted to retain all the benefit of their contracts with each other yet refuse to perform the most substantial of their obligations. The defendant received a franchise which was of pecuniary benefit to it; it has expended large amounts in developing the railway lines for which the franchise was given. It is manifest defendant cannot place the plaintiff in *statu quo* except at disastrous sacrifice to itself. In such a situation it is too late for it to claim that this condition of the grant is *ultra vires* or to attack this contract upon other grounds. It will

not be allowed to hold the contract valid except as to the single provision but invalid as to that. That situation does not present a case of *ultra vires* in its true legal sense. The public utility will be bound by the condition that the municipality had no power to impose, provided the municipality had the power to consent or refuse to grant the franchise, and the utility accepted the grant with the conditions imposed and thereby executed the contract, and in pursuance of the grant has constructed and long operated under its contract, and purposes so continuing. *Southern Pacific Co.* v. *Portland,* 227 U. S. 559, 33 Sup. Ct. 808; *Rutherford* v. *Hudson River Traction Co.,* 73 N. J. L. 227, 63 Atl. 84; *Jersey City* v. *North Jersey Street Ry. Co.,* 72 N. J. L. 383, 61 Atl. 95; *Mitchell* v. *Dakota Central Telephone Co.,* 25 S. D. 409, 416, 127 N. W. 582; *Hanford Gas & Power Co.* v. *Hanford,* 163 Cal. 108, 111, 124 Pac. 727; *Valdez* v. *Valdez Dock Co.,* 5 Alaska, 399; *People ex rel. FitzHenry* v. *Union Gas & Electric Co.,* 260 Ill. 392, 103 N. E. 245; *Pensacola* v. *Southern Bell Tel. Co.,* 49 Fla. 161, 37 So. 820; *St. Louis & M. River R. Co.* v. *Kirkwood,* 159 Mo. 239, 253, 60 S. W. 110; *People ex rel. Jackson* v. *Suburban R. Co.,* 178 Ill. 594, 606, 53 N. E. 349; *Simons Sons Co.* v. *Maryland Tel. & Tel. Co.,* 99 Md. 141, 175, 176, 57 Atl. 193; *Mercantile Trust & Deposit Co.* v. *Collins Park & B. R. Co.,* 101 Fed. 347, 351; *Potter* v. *Calumet Electric Street Ry. Co.,* 158 Fed. 521; *Allegheny* v. *Millville, E. & S. Street Ry. Co.,* 159 Pa. St. 411, 28 Atl. 202; 4 McQuillin on Municipal Corporations (1st Ed.) §1688.

The defense of *ultra vires* was advanced in *New Haven* v. *Fair Haven & Westville R. Co.,* 38 Conn. 422, in resisting the payment of an assessment levied upon the property of the defendant for lack of authority of the city to levy it, although the defendant had

Hartford *v*. Connecticut Co.

suffered the city to make the improvements for which the assessment was levied with knowledge of the proceedings taken and without objection to them. We held: "The presumption therefore is, in the absence of any finding to the contrary, not only that the defendant consented to the making of the improvement by the city, but that there was an implied understanding that the defendant was to bear its fair proportion of the expense. We think, therefore, that the defendant should be estopped from setting up this claim." Our court in this decision has applied the principle of estoppel as the many authorities we have cited applied it. In this jurisdiction a corporation or an individual contracting with a municipality is estopped to defend against the enforcement of a single provision of the contract which has been accepted and its benefits long and continuously enjoyed and still retained, upon the ground that the single provision is beyond the power of the municipality to have made. Defendant appeals to equity as the origin of estoppel. It can find no succor in equitable principles. The contract it made was of its own volition, made upon a valuable consideration which was incapable of accurate estimate when made; the city of Hartford consented to the grant of the franchise to defendant; its business since that grant has been largely based upon the consent so given; it cannot keep all that it received and refuse to do what it agreed to do in consideration of the grant,— that would not be equitable, indeed it might be characterized by a harsher term.

Two rulings on evidence should be noted. The defendant offered in evidence certain records of the board of street commissioners of Hartford covering certain hearings and discussions held by that board in reference to a petition presented to the common council and upon which no action was taken by the council.

This was prior to the petition which culminated in the Tucker grant. The evidence was offered for the purpose of showing that at these hearings the percentage of the gross receipts, which it was suggested and discussed that defendant should be required to pay, was consistently referred to as a tax, and this testimony was claimed by defendant's counsel to be relevant for the purpose of determining whether or not the percentage of the gross receipts which defendant was required to pay in the Tucker grant was in fact a tax. The evidence was clearly irrelevant and immaterial. It comprised no part of the action which finally culminated in the Tucker grant. The communication of the railway dated January 8th, 1894, was referred to a special joint committee and not to the board of street commissioners. That board never had before it the communication leading to the passage of the Tucker grant. The petition before the street commissioners never resulted in action by the common council.

The offer also was not admissible for the purpose of proving as a fact the meaning of the payment of the two per cent of gross receipts found in the Tucker grant. Finally, discussions and statements made before a committee of a legislative body, or in debate before that body, are not admissible in proof of a legislative intention in an Act passed by the body, for the reason that it is impossible to determine what effect the individual discussion had upon the action taken. *Litchfield* v. *Bridgeport,* 103 Conn. 565, 573, 131 Atl. 560; *Duplex Printing Press Co.* v. *Deering,* 254 U. S. 443, 474, 41 Sup. Ct. 172; *Banco Mexicano* v. *Deutsche Bank,* 263 U. S. 591, 44 Sup. Ct. 209; *Plunkett* v. *Old Colony Trust Co.,* 233 Mass. 471, 474, 124 N. E. 265. The testimony of Mr. Goodrich upon the same point was even more objectionable, for it

included idle street talk. As the court found that the two per cent as a matter of fact was a tax, we cannot hold the admission of this evidence to have been harmless.

There is error, the judgment is set aside, and the cause remanded to the Superior Court with direction for an accounting by defendant in accordance with plaintiff's Exhibits A and B, and this opinion, for all payments accruing thereunder on and after January 1st, 1924, together with interest upon each payment from the time it became due, and for the rendition of a judgment in favor of the plaintiff for the amount found due upon such accounting.

In this opinion the other judges concurred.